[Civ. No. 4142. Third Appellate District.—October 22, 1930.]

J. S. STEVENS et al., Respondents, v. SACRAMENTO SUBURBAN FRUIT LANDS COMPANY (a Corporation), Appellant.

[Civ. No. 4143. Third Appellate District.—October 22, 1930.]

JOHN R. LAYTON et al., Respondents, v. SACRAMENTO SUBURBAN FRUIT LANDS COMPANY (a Corporation), Appellant.

[Civ. No. 4144. Third Appellate District.—October 22, 1930.]

N. E. ISENBERGER, Respondent, v. SACRAMENTO SUBURBAN FRUIT LANDS COMPANY (a Corporation), Appellant.

Butler, Van Dyke, Desmond & Harris for Appellant.

Ralph H. Lewis and George E. McCutchen for Respondents.

MR. JUSTICE PLUMMER Delivered the Opinion of the Court.—Three separate actions are combined and presented for our consideration upon this appeal. The three actions are presented, in part, upon one transcript and argued in one set of briefs. The actions are prosecuted to obtain a judgment for damages based upon fraud and deceit, alleged to have been practiced upon the respective plaintiffs by the defendant in the sale of distinct and separate parcels of land to the respective plaintiffs, one tract of land being sold to the plaintiffs Stevens, one tract of land to the plaintiffs Layton, and one tract of land to the plaintiff Isenberger. The land involved in the several actions is situate approximately nine or ten miles north of the city of Sacramento, in the district known as and called the ''Rio Linda'' district.

In 1912 the defendant company purchased a tract of 12,000 acres of land, subdivided the same and entered upon the work of selling the land in tracts of five and ten acres. The purchasers came mainly from the northwestern states. The home office of the company was located in the city of Minneapolis. A local office was maintained in the city of Sacramento, under the charge of a general manager. The Plaintiffs Stevens purchased a ten-acre tract; the plaintiffs Layton and the plaintiff Isenberger purchased five-acre tracts. The complaints in the three actions are practically identical. The respective complaints, in setting forth a cause of action, alleged that the defendant, through its agents, represented to the purchasers that the land was rich and fertile, capable of producing all sorts of farm products; that the soil was entirely free from all conditions and things injurious or harmful to the growth of fruit-trees. It was further represented that the land was well adapted to the raising of fruits of all kinds; that fruit-trees of all kinds

would thrive and flourish thereon and produce fruit of best quality and in large and commercial quantities; that all kinds of fruits of finest quality and of commercial quantity were being grown and produced upon adjoining lands of the same quality and texture. The respective complaints further alleged that the land was represented to be of the reasonable market value of $350 per acre, whereas, in truth and in fact, it was worth only a sum showing a value of $15 per acre. The answers of the defendant deny the allegations of the complaints as to the fraudulent representations; admit its existence as a corporation organized under the laws of the state of Minnesota, and, as a further defense, plead the statute of limitations in the following words: "That this action and cause of action is barred by the provisions of section 338 of subdivision IV thereof of the Code of Civil Procedure of the state of California."

While the defense of the statute of limitations is pleaded in the form above stated, the answers of the defendant contain no allegation of the corporation having complied with the statute relative to the filing with the Secretary of State of the state of California a designation of an agent upon whom service of summons might be made as provided by the act of the legislature of 1917 (Stats. 1917, p. 371, and as amended in 1921 and 1923; Deering's General Laws of California, Act 1743), a necessary prerequisite in order to toll the statute of limitations.

As the argument upon this appeal revolves around the purchase made by the plaintiffs Stevens, of lot 14 of Rio Linda, Subdivision No. 5, this opinion will be devoted first to a discussion of the issues relating to that action.

The record discloses that prior to the year 1923 the plaintiffs Stevens were residents of the town of Frederick in the state of Wisconsin, and owned eighty acres of land in Bayfield County, in said state, of the value of aboue $1,000, and a Ford automobile of the value of some $450; that neither one of the plaintiffs had ever visited the state of California, and that both of the plaintiffs were entirely unfamiliar with farming conditions, not only in the Rio Linda district, but also with farming conditions in the state of California; that while the plaintiffs were so residing in the state of Wisconsin the defendant furnished the plaintiffs with a booklet descriptive of the advantages of the Rio Linda district, and

an agent of the company called upon the plaintiffs and made all of the representations contained in the complaint, and also other representations set out in the testimony, all of which were alleged to be false and fraudulent, and well known to be such; that relying upon such false and fraudulent representations, the plaintiffs entered into a contract of purchase with the defendant, the purchase involving a transfer to the defendant of land then belonging to the plaintiffs in Bayfield, Wisconsin, and also the transfer to the defendant of the Ford automobile herein referred to, the value of the land being represented to the plaintiffs at the sum of $350 per acre. The contract of purchase was entered into in December, 1922, and in September of the following year the plaintiffs came to California, and in November, 1923, bought a small tract about three-quarters of a mile from the land in controversy. It does not appear that the plaintiffs ever resided upon the land involved in this action.

The trial court, preceding the signing and filing of findings herein, expressed its views in a written opinion, from which we take the following: "The court is of the opinion that by reason of the thinness of the soil upon the tract of land, and the nature and thickness of the hardpan underlying it, that it is not adapted to, nor will it successfully produce fruit in any considerable quantity. The nature of the soil and the underlying hardpan are of such a character that fruit trees will not mature and continue to bear, but, on the contrary, will wither away and die. The court is further of the opinion that plaintiffs were entirely ignorant of the nature and character of the soil and hardpan on said land, and for knowledge of the same relied entirely upon the representations of the agents of defendant, and that while these agents did set forth in booklets that the soil was underlaid with hardpan, yet by representations they led plaintiffs to believe that the hardpan would in no wise prove a detriment to the growing of fruit. Taking the evidence as a whole, it is apparent that representations were made to plaintiffs by defendant's agents that the land was well suited to the production of fruit in merchantable quantities, and that after the lapse of a few years the orchards planted and growing upon said land would net a considerable income. These representations were and are not true and

must have been known to defendant's agents to be untrue when they were made.'' The court in its opinion further stated: ''It appears to the court that these plaintiffs were wholly unfamiliar with the land, the nature of its soil, its productiveness, its adaptability to fruit growing, and that they relied entirely upon the representations of defendant's agents as to all these matters, and continued to do so until along in 1926, when the fruit trees planted a few years prior thereto began to wither and die.'' The court further stated in its opinion, relative to the provisions of section 338 of the Code of Civil Procedure, relied upon as a defense, as follows: ''That this defense cannot avail defendant in this action. The untruthfulness of the representations made the defendant's agents was not discovered by plaintiffs until within the three-year period prior to the commencement of this action. Relying as they did upon the representations of defendant's agents, as aforesaid, they were not put upon notice of their falsity until the trees began to wither and die.''

While the contract of purchase was entered into in the year 1922, the plaintiffs did not come to California until September, 1923, and, as stated, had not seen the land prior to the time of entering into the contract.

The record shows abundant testimony to the effect that the plaintiffs relied upon the statements of the defendant's agents as to the character and quality of the land, and a review of the testimony satisfies us that the findings of the court in accordance with its opinion, and which we have quoted, are sufficiently supported. We may add that in addition to stating that the land was suitable for the raising of all kinds of fruits, commercially, the agent represented to the plaintiffs that while the price, at the time the negotiations were being had, was $350 per acre, on and after the 1st of January of the following year it would be advanced $50 an acre. A short excerpt from the testimony of one of the plaintiffs of what occurred at one of the interviews had between the agent of the defendant and the plaintiffs, while they were living in Wisconsin, is sufficient to illustrate the character of the representations: ''He (referring to the agent) came to our home one evening about 7 o'clock and we were there until about 1 o'clock in the morning. He had photographs, an album of views, taken

out there in the district. The views were very beautiful—fruit growing—and intimated they were taken here (referring to Rio Linda). I did not know before he wanted to sell us some of this land. He said there was nothing better in California. It would grow anything, and if Mr. Stevens and I would go there, we would be independent in a short time, say five years. We would have to keep poultry as an investment to make our payments. We realized we were not able to pay that amount, and we asked him about it. He said that our payments, we could make all those payments in 5 years, and we could let our poultry go. We could be independent in 5 years. He said the land certainly was adapted to grow anything; all kinds of fruit would grow there.'' The pamphlets referred to contained a great number of photographs of places many miles removed from Rio Linda, and do show what can be raised and accomplished in California where the character of the soil admits of a high degree of cultivation, and one unacquainted with distances and locations, and living in a distant state, would almost certainly be misled thereby. Two excerpts from the pamphlets or booklets will serve to illustrate what we have just said: ''The Rio Linda district to-day is the home of nearly 250 families—a happy, thrifty people—all in possession of their own homes, their own orchards and gardens and profit-paying poultry flocks. The Rio Linda district is no painted picture—what we say here is no overdrawn description of what is hoped may come to pass. Rio Linda is an actuality. The people are there; the rapidly increasing poultry flocks are there, and the opportunity is there for you to-day at Rio Linda.'' A second excerpt from one of the booklets reads as follows: ''Though the soil condition in California varies greatly in different districts, the soil in the Rio Linda district is very uniform. The surface of the land looks almost level to the eye, though actually it has gently rolling slopes and undulations which naturally assist in drainage and irrigation. The top soil, generally speaking, is what is known in California as a sandy clay loam. This top soil varies in depth, is a friable soil and variously adapted to the different fruit trees and vines. The subsoil is a closely packed clay, varying in depth, texture and character. With reference to this clay subsoil the United States Government soil reports show that the majority of the

lands in the Sacramento and San Joaquin valleys are underlaid with a hard clay stratum commonly known as hard-pan.'' This latter quotation is relied upon by the defendant as containing a statement sufficient to place the plaintiffs on notice relative to the existence of hard-pan. We may here state, however, that after the plaintiffs came to California, and had been here some months, and heard some talk about hard-pan, they asked a man who was acting as horticultural expert of the defendant, as to the existence of hard-pan and its effect upon fruit growing, and to their query the reply was made that the hard-pan acted as a ''sort of fertilizer''. It will be noticed that the excerpt which we have last quoted makes no reference to the fact as to whether the hard-pan in the Rio Linda district is near the surface, nor does it make any reference as to whether the hard-pan in the fertile sections of the Sacramento and San Joaquin valleys is in the so-called ''fertile'' districts, so far below the surface as not to interfere with cultivation.

Without further reference to the testimony establishing the alleged fraudulent representations, we will content ourselves with the statement that a review of the record satisfies us that the findings of the trial court as to such representations, are sufficiently supported.

■ The minor point made by the appellant that the testimony does not show the damages allowed by the court, we likewise think untenable. The record contains evidence to the effect that the lot in question was of the value of only about $75 per acre, and also, that had it been of the character represented, it would have been of the value of $350 per acre, which furnishes a basis for the court's conclusion as to the amount of the damages, and it satisfactorily appears that the court followed the California rule that the damages suffered on account of misrepresentations, are to be ascertained by determining the fair market value of the land as it is, and what it would have been had the representations been true.

■ The main contention of the appellant is to the effect that the several causes of action involved in this appeal are barred by the statute of limitations. Upon this question the trial court found as follows: That the allegations of the plaintiffs' complaint to the effect that it was not apparent, to persons not expert in fruit culture, prior to 1927, that the

lands were not well adapted to the raising of fruits; that prior to the year 1927, it was generally believed by all the settlers and neighbors situate on lands adjoining the plaintiffs, that the lands were especially adapted to the culture of all kinds of deciduous fruits; that the plaintiffs did not have any occasion to suspect that they had been defrauded prior to the year 1927; that the plaintiffs relied upon the representations of the defendant's agents, that the hard-pan was not injurious to the raising of fruit-trees, and that the agents of the defendant lulled the plaintiffs into security by representations that the hard-pan was not injurious but acted as a fertilizer.

The record shows that the plaintiffs came to California on or about September 23, 1923; and as we read the testimony it indicates that there were sufficient facts and circumstances discovered by the plaintiffs to put them upon inquiry, some time the latter part of the year 1925, and at least during the year 1926. The action by the plaintiffs Stevens was begun on August 4, 1927. It is strongly insisted by the appellant that the discovery should have been made much earlier, and that there were sufficient facts and circumstances apparent from which the plaintiffs should, and could, have obtained knowledge of the fraud at a period antedating more than three years, the date of the beginning of the action. As said in 16 California Jurisprudence, 501: "In the determination of this question, if it appears that a person has notice or information of circumstances which, if followed, would lead to knowledge, or that the facts are presumptively within his knowledge, he will be deemed to have actual knowledge of the facts. In such case, the familiar rule that every person who has actual notice of circumstances sufficient to put a prudent man on inquiry, is deemed to have actual notice of the fact itself in cases in which by prosecuting the inquiry he might have learned the fact is applied. The courts, however, do not lightly seize upon some small circumstance to deny relief to a party plainly shown to have been actually defrauded upon the ground that he did not discover the fact that he had been cheated soon enough. Where there is no duty upon a person to make inquiry and under the circumstances a prudent man would not be put upon notice, the mere fact that means of knowledge are open will not debar one from relief when discovery is after-

wards made; the circumstances must be such that inquiry becomes a duty, and a failure to make it a negligent omission. And, where ignorance of the fraud is produced by the affirmative acts of the guilty party, a failure to discover the fraud is excused and the statutory period will not run until actual discovery of the facts.''

The authorities supporting the text just quoted are exceedingly numerous and need not be cited. The plaintiffs, during all the negotiations relative to the purchase of the tract of land involved, were residents of the State of Wisconsin, a state in which the soil is entirely dissimilar, the methods of cultivation almost wholly unlike those followed in California. One is a state where agriculturists depend upon rainfall; the other, where irrigation is necessary for the success of horticultural undertakings. The Rio Linda district is shown by the testimony to be what is called ''upland'' territory; it does not lie adjoining any stream of water; irrigation is necessary for the profitable cultivation and raising of any kind of fruit. For successful irrigation there must be sufficient drainage. Whether such drainage conditions exist depends upon the condition of the subsoil, and one unfamiliar with the character of the lands involved in this action could ascertain this fact only by experimentation. The testimony shows that the orchards pictured in the booklets were not upon lands similar to those sold the plaintiffs in these actions. The testimony does show that by experimenting in different parts of the 12,000 acres heretofore referred to as being the tract placed upon the market by the defendant, fruit-trees had been successfully propagated where the soil was underlaid with hard-pan, but that to do so it was necessary to blast the hard-pan. No one coming from Wisconsin where such conditions do not exist, could reasonably be expected to have in mind the necessity of blasting in order to set out a tree. Again, whether even blasting will enable one to succeed in raising fruit-trees depends upon whether sufficient drainage is thereby secured. Further, the testimony shows that it requires two or three years to determine whether a tree will grow. If drainage cannot be had, or is not had, the tree will apparently thrive for a year or two, and then wither and die. It does appear that the plaintiffs ascertained the existence of hard-pan in the Rio Linda district, but as herein stated, were advised

by a representative of the defendant that hard-pan acted as a "sort of fertilizer".

This being an action for damages, and not an action for rescission, the question of laches does not enter into a determination. However, cases having to do with that subject are applicable upon the question of discovery. In the case of *Dickey* v. *Dunn*, 80 Cal. App. 724 [252 Pac. 770] it is said: "Where a purchaser is justified in relying, and in fact does rely upon false representations, his right of action is not destroyed because means of knowledge were open to him (citing *Teague* v. *Hall*, 171 Cal. 668 [154 Pac. 851]), and while it appears that plaintiff visited the property before the transfer was made, the evidence sufficiently supports the finding that he relied upon the representations both as to its value and character. The statements as to the character of the soil and as to water supply were clearly representations of fact. (Citing *French* v. *Freeman*, 191 Cal. 579 [217 Pac. 515]; *Stone* v. *McCarty*, 64 Cal. App. 158 [220 Pac. 690].)"

Again, in *Powell* v. *Oak Ridge Orchards Co.*, 84 Cal. App. 714 [258 Pac. 636], on the subject of laches, we find the following: "There is no artificial rule as to the lapse of time or circumstances which will justify the application of the doctrine of laches (citing cases), the question of whether or not a party defrauded has rescinded promptly depending upon all the circumstances of the particular case and being primarily one for the trial court to detemine (*French* v. *Freeman, supra*); and if its conclusions thereon find reasonable support in the evidence the reviewing court will not interfere therewith (*Suhr* v. *Lauterbach*, 164 Cal. 591 [130 Pac. 2]). Interference here, under the circumstances stated, would in our opinion be clearly unwarranted, it appearing that plaintiffs acted with reasonable diligence."

Applying the principle announced in these cases to the Stevens and Isenberger cases, it would be primarily the duty of the trial court to ascertain and determine both discovery and knowledge on the part of the plaintiffs, and whether the circumstances were such as to put the plaintiffs upon inquiry by means of which they could and should have earlier discovered the character and condition of the soil, its unfitness for fruit-raising, and the misrepresentations on the part of the defendant's agents.

In the Orchards case, *supra,* the plaintiff purchased the premises on January 23, 1921, and took possession immediately. In July, 1922, he discovered the trees were dying. He made the offer of rescission on February 15, 1923, and began suit in April, 1923. As we have seen, the delay in that case was held excusable. A year and a half elapsed between the purchase and the discovery of the fraud. In the Dunn case, *supra,* the delay in discovering the falsity of the representation as to the value and character of the soil, was a trifle over two years.

In *Scott* v. *Delta Land Co.,* 57 Cal. App. 320 [207 Pac. 389], in which it was held that misrepresentations as to the productive quality of the soil and the adequacy of the water supply were material factors, a delay of a few days over one year was held excusable. In that case we may say it further appeared that the quality of the soil could only be determined by chemical analysis or by actual experimentation. Hence, there could be no imputation of negligence, because Scott, a farmer, having been afforded an opportunity to see and examine the soil, did not at once discover its true character. In the case at bar the plaintiffs, after coming to California, of course had an opportunity to view the lot in question, but could only determine the character of the soil by having an analysis made of it, or by actual experimentation. That the latter course is one which would be followed, and which it was reasonable for a farmer to follow, cannot be gainsaid, and therefore it cannot be held as a matter of law that the plaintiffs were negligent in relying upon experimentation rather than having an analysis of the soil made in order to determine whether it was fit for the setting out and cultivation of fruit-trees.

That the misrepresentations were all material and sufficient upon which to base an action, in addition to the cases listed we may cite the following: *Stone* v. *McCarty,* 64 Cal. App. 158 [220 Pac. 690]; *Palladine* v. *Imperial Valley, etc.,* 65 Cal. App. 727 [255 Pac. 291]; *Gammon* v. *Ealey & Thompson,* 97 Cal. App. 452 [275 Pac. 1005]; *French* v. *Freeman,* 191 Cal. 579 [217 Pac. 515]; *McMahon* v. *Grimes,* 206 Cal. 526 [275 Pac. 440].

In support of its contention that the actions herein are barred by the statute of limitations, the defendant calls our attention to the recent decision of the Circuit Court of

Appeals in the case of *Sacramento Suburban Fruit Lands Co.*
v. *Johnson*, 36 Fed. (2d) 935, and the companion cases there
referred to. The Johnson case, however, is readily dis-
tinguishable from the case prosecuted by the plaintiffs Ste-
vens. In the Johnson case the following instruction on the
subject of discovery of fraud was given: "Moreover, he is
told by the circular that to bring an orchard to bearing
takes five to seven years. He has a right to test it out.
He wouldn't be obliged to grasp and believe anybody's
statement if he heard it, that it was not adapted to commer-
cial orchards, and he would have five to seven years, accord-
ing to defendant's theory, to test it out, if he didn't other-
wise find out it was not adapted to commercial orchards.
He says he planted his trees in 1924, and seeing them die,
as they did mostly in 1927, his theory is that it was then
that he discovered, and only then, that the land was not
adapted to the commercial growing of fruit." The Circuit
Court then says: "Under this instruction the plaintiff
might bide his time for the full period required for the
maturing of an unplanted orchard, unless he happened to
find out through some other source that the land was not
adapted for orchards. . . . The instruction falls short of the
rule of diligence required in such cases."

In the Jensen case, reported in the same volume, page
936, reversal was had by reason of error of the court in its
instructions to the jury.

In the Anderson case, reported in the same volume, page
937, the judgment of the trial court was affirmed.

In the Tipper case, reported in the same volume, page 941,
the judgment in favor of the plaintiff was also affirmed.

In the principal case of *Sacramento Suburban Fruit Lands
Co.* v. *Melin*, reported in the same volume above referred to,
page 907, it appears that the plaintiff visited the Rio Linda
district before entering into a contract of purchase. It
appears also in the Melin case that the cause was reversed
on account of errors in instructions, one of which related
to the representation as to the value of the land, the court
in the Melin case saying: "In order that a purchaser may
rely on a vendor's representation as to value of the prop-
erty, it is not sufficient that the vendor has greater infor-
mation or superior judgment, but it generally must appear
that the land is remotely situate, or for other reasons the

sources of information are not reasonably available to the purchaser.'' Here we have a situation readily distinguishable. At the time the contract was entered into the plaintiffs were residents of the State of Wisconsin, and that the State of Wisconsin is a long distance from the Rio Linda district is a fact of which we must take judicial notice. At the time the contract was entered into, the plaintiffs had no information concerning the value of the land, its character, quality or capabilities, other than that furnished by the defendant; nor can we say that they had any reasonable means of acquiring such information prior to the date of entering into the contract. Erroneous instructions as to the question of good faith on the part of the defendant also entered into the decision in the Melin case. One of the tracts involved in the Melin case was purchased in 1921; the action was commenced August 14, 1927. A much longer period was involved than in the case of the plaintiffs Stevens; likewise, a dissimilarity as to the means of information possessed by the respective plaintiffs. One came to California and inspected the land before purchasing, and had an opportunity to make inquiries in the nearby populous city of Sacramento. The plaintiffs Stevens had no such opportunity. The following cases were reversed by reason of instructions held to be erroneous: *Sacramento Suburban Fruit Lands Co.* v. *Boucher,* 36 Fed. (2d) 912; McKew case, same volume, page 917; Curtis case, same volume, page 923; Haenggi case, same volume, page 923. The following cases were affirmed by reason of there being no errors in the instructions: Loucks case, same volume, page 921; Miller case, same volume, page 922.

A review of the different cases in the volume to which we have referred, we deem unnecessary as the circumstances are different, and as the reversals were had for errors occurring during the course of the trial. We may, however, refer to the case of *Sacramento Suburban Fruit Lands Co.* v. *Schreindl et al.,* reported in the same volume, beginning on page 932, wherein it was held not error to give an instruction to the effect that a purchaser, in an effort to discover the fraud practiced upon him, was not obliged to employ experts, or make abstruse and difficult investigations, just as we have stated heretofore in this opinion. It was not necessary for the plaintiffs to have employed someone

qualified to make an analysis of the soil but they had a right to rest upon experimentation and the usual means employed by farmers, in determining whether the lands in question would or would not fulfil the representations which had been made. In the case just referred to the judgment was affirmed.

■ The conclusion to be gleaned from the cases relied upon by the appellant is that the circumstances must, in each case, be examined to determine whether the plaintiff, as a reasonable person, should have made prior discovery of the fraud, and that no hard-and-fast rule can be laid down as to the time within which such discovery must be made in order to bar the plaintiff's right of action. If the facts show that the purchaser, as a reasonable person, had the means of discovery, and should have made the discovery and prosecuted his inquiry leading up to the knowledge of the fraud practiced upon him at a period more than three years prior to the beginning of the action, then the cause should be held barred; otherwise, not.

■ In the companion case of E. N. Isenberger against the defendant, the testimony relative to representations is practically the same as what we have hereinbefore set forth, but in addition thereto, it clearly appears that Isenberger came to California, first, in December, 1924. The complaint in his action was filed on August 15, 1927. Three years had not elapsed from the date on which this plaintiff came to the state, and the beginning of his action. The testimony showing that he had no reasonable opportunity to discover the existence of the fraud and did not have any actual opportunity to discover the same, there is no basis upon which the plea of the statute of limitations can rest. The circumstances presented in the case of the plaintiff Isenberger are very similar to the circumstances considered in the case of *Nichols* v. *Moore,* 181 Cal. 131 [183 Pac. 531]. The findings of the court in the Isenberger case are sufficiently sustained, and nothing presented as to this cause seems to merit further consideration.

In the action entitled "John R. Layton and Louise S. Layton", we have a state of facts which calls for a consideration of whether the statute of limitations should be held to run in favor of the defendant. The record shows that John R. Layton has lived in California ever since 1912; that

prior to coming to California he had lived for twenty years on a farm in Iowa; had given most of his attention to raising oats, wheat and grain; had had no experience in the fruit business, other than raising fruit-trees which supplied fruit for family use; had never attempted to raise fruit for commercial purposes. The plaintiff Louise S. Layton was raised on a farm in Oregon and has lived in Sacramento ever since 1916. The plaintiff John R. Layton came to the city of Sacramento to live in the year 1921, and prior thereto, for a number of years, had lived in different places in the county of Sacramento, within a few miles of the city of Sacramento. On or about January 24, 1922, the plaintiff Layton entered into a contract with the defendant to purchase the west half of lot 134 of Subdivision No. 6 of the Rio Linda tract, and thereupon went to the Rio Linda district to live, and remained there until November, 1922, when he came back to Sacramento. The return to Sacramento was made in order that the plaintiff John R. Layton might obtain work as a carpenter—that being the real vocation followed by him after coming to California in 1912. The record shows that John R. Layton, while out riding in the Rio Linda district, saw a sign on the highway indicating the person handling the tract of land under consideration, and thereafter went and looked up the party at his office at 613 J Street and inquired about the land. Thereafter a man by the name of McNaughton, on behalf of the company, called for and took the Laytons out to inspect the Rio Linda district. McNaughton, it appears, was not a salesman, but a horticulturist. McNaughton showed the Laytons several pieces of land. About one-half day was spent in looking at different tracts. ''McNaughton showed us the Reese place, Reese's young orchard and poultry farm. We stopped at the Reese corner and walked up about a quarter of a mile north, and McNaughton showed us a piece of land there; I think it was five acres. I didn't like that piece, so we came back and got in his car and we drove over to the west of Rio Linda. I don't remember the man's place, but a little place northwest of Rio Linda; showed us the young orchard he had out. He had a nice flock of chickens running in the orchard; he showed us how the man was taking care of it; then he took us out to Mr. Campbell's place; showed us his young orchard; showed us, also, a

flock of young pullets. Campbell told us what his intentions were with his chickens and his orchard. McNaughton took us about ¾ of a mile west and showed us another piece of land; then we came back to Sacramento. McNaughton also took us out to Mr. Lydon's place, and Mr. Lydon lectured to us on the poultry-house, about raising poultry. Also, Mr. McNaughton gave us a short talk to show people how to plant their trees, and also the care of them. On the next occasion we visited Rio Linda, Mr. Brennan took us out. He came to our house and took myself and wife. Mr. Brennan simply showed us the same piece of land Mr. McNaughton showed us at first that didn't suit us; then he took us on north of Rio Linda and showed us another piece that didn't suit us; then he took us over to Subdivision 6 and showed us land over there. I didn't like the way the land lay; the water was standing on it; you couldn't walk out to a part of it. Then he showed us a piece that we passed; it was really the best drained from water standing on it. I asked if that piece had been sold. Mr. Brennan said no. It was a 10-acre tract, and I told him I couldn't handle 10 acres. Then he said he would see if the company would split it. It suited me very well. He told me that piece of land was worth $350 an acre. He said it was good, fertile soil, rich loam soil, and would raise any kind of fruit that could be raised in California. He told us also that from that particular piece of land we could get an income of $1,200 or $1,500 a year when the orchard got to bearing, got to full bearing. Mr. Brennan told us to get a flock of chickens for the first thing, and raise chickens while the fruit was coming on. In the office of the company we asked Mr. Crinkley what kind of fruit the land would raise, and what he would suggest planting on the ground. He said peaches, plums, cherries, apricots and pears. He said it would grow commercially.'' The foregoing is taken from the testimony of the plaintiff John S. Layton, and covers the representations.

The witness further testified that he believed what was told him, and to the question whether that influenced him in any way in signing up the contract, answered: ''Nothing, only telling me that it was good, rich, fertile land, will grow all this stuff.'' The witness further testified that if they hadn't told him such things, he would not have signed. The witness also testified that prior to the signing of the

contract Mr. Brennan told him that there was hard-pan upon the land, the language of the witness being: "Brennan told me there was hard-pan. Brennan said there was hard-pan, but that it didn't amount to much." With reference to its effect upon fruit raising, the witness testified that Brennan said it would not hurt them at all. He said, "Just blast; the stuff didn't hurt them at all". He said, "Usually, it would be a fertilizer for the ground." The testimony is further to the effect that after the plaintiffs moved out to the tract of land in question, a well was sunk and hard-pan was disclosed by the digging of the well, or rather, boring of the well, but that no attention was paid to it. After going out to the premises in 1922, the Laytons planted six trees. The hole in which the trees were planted was dug down about a foot or a little more. The plaintiffs did not consult anyone, in connection with the company, about planting the trees. These trees only lived about three months. In planting the trees, the holes were not dug down to hard-pan, the witness testifying: "I didn't go down to hard-pan at that depth where I set out the trees." On November 22, 1922, the plaintiffs moved back to Sacramento. The plaintiffs did not set out any more trees on the land or make any further improvements or developments because they did not have any money. The plaintiffs then bought a lot in the city of Sacramento, and testified that in the laying of a sewer or sewer pipe in said lot, hard-pan was encountered. This, the witness stated, was given little or no attention. It further appears that the plaintiffs inquired of Mr. McNaughton, one of the men connected with the defendant, as to the cause of the death of the six trees which they had set out in 1923, shortly after their death, and McNaughton replied that he could not tell them. John R. Layton further testified that the death of the trees did not arouse any suspicion in his mind; that he could not imagine what was the matter with the trees. The record then shows that the plaintiffs moved back to the Rio Linda district late in the year 1925, being away from the property in controversy nearly three years. After returning to the five-acre tract in 1925 the plaintiffs planted a garden thereon in the year 1926, from which they obtained no returns. The plaintiffs testified that this aroused their suspicions, and that they began to make inquiries and were told that they had

been cheated. Prior to this the plaintiffs had not talked to anybody about the value of the land or to anyone about its cultivation.

This action was begun on August 11, 1927, five years and eight months after the contract of purchase herein referred to, and after the plaintiffs moved out to the five-acre tract to live. The record also shows that there was some conversation between John R. Layton and a representative of the company, as to being able to obtain carpenter work in the Rio Linda district, in which the witness was informed that the representative thought he could obtain such work. No such work, however, was obtained. The testimony of the plaintiff Louise S. Layton was substantially the same as that of the testimony of the plaintiff John R. Layton.

The record further shows that some time during the latter part of 1923 and early in 1924 the plaintiffs endeavored to sell the tract of land in question and were informed that the price was too high.

While the record shows that the plaintiff John R. Layton had lived in the county of Sacramento for a number of years; had come in contact with farms where orchards were being planted and cultivated; it does not show that he availed himself of the opportunity to become acquainted with the various soils found in the different portions of the county where he had lived and worked. The price at which the plaintiffs offered their property for sale was less than they had contracted to pay for it and, as just stated, were informed that the price was too high. According to the testimony of the plaintiffs, none of these occurrences caused them to make any inquiry as to the value of the land or the quality of the soil contained therein. The record further shows, as stated by the witness John R. Layton, that in planting trees it was necessary to blast. This blasting was for the purpose of breaking up the hard-pan to permit drainage, and also to permit the roots of the trees to penetrate the soil the necessary depth below the surface to maintain tree life. The testimony further shows that the plaintiffs, while living in Sacramento for a number of years and close to the lands involved, made no inquiry of anyone concerning the same, either as to value or quality of soil, or the adaptability thereof for fruit-raising, or for any purpose. Likewise, the record shows that a number of days

elapsed between the time the plaintiffs first considered purchasing the land in the Rio Linda district and the time when the final contract of purchase was entered into, during which time the plaintiffs made no inquiries of anyone as to the quality of the soil, or as to the value of the property. This case differs also from that of the Stevens and Isenberger cases in that the plaintiffs were informed that there was hard-pan in the five-acre tract, and that it would be necessary to blast through the hard-pan when setting out trees. The plaintiffs also in this case had an object lesson as to hard-pan in the boring of the well upon the premises. Likewise, an object lesson as to the existence of hard-pan, when digging the sewer upon their lot in east Sacramento.

The question presented by the foregoing is whether finding No. 3 of the trial court is supported by the testimony. That finding reads, so far as material here: "That plaintiff did not discover, and could not with reasonable diligence have discovered the falsity of any of said representations prior to February, 1927. . . . " While it is true that John R. Layton followed the vocation of a carpenter in California, he had had a number of years' experience upon a farm in Iowa, and if possessed of ordinary intelligence, gained some knowledge of agriculture, even though it might not have acquainted him with the different quality of soils and their productive powers. However, the plaintiffs had knowledge, in the year 1922, of the existence of hard-pan. That they may not have had knowledge of its unproductive qualities or deterrent qualities may also be true, but having been advised that it would be necessary to blast the hard-pan before setting out trees, and having disregarded such advice and set out trees without blasting, and the trees only living for a few months thereafter certainly constituted a discovery of facts sufficient to put a reasonable person upon inquiry as to the character and quality of the soil, and sufficient to induce any reasonable person to make inquiries as to what should be done in order to profitably cultivate trees, and whether trees could be successfully grown and profitably cultivated upon the five-acre tract. Notwithstanding this, the plaintiffs moved away from the premises and remained away nearly three years, living in Sacramento, only nine miles, or thereabouts, distant, where there were

any number of real estate dealers of whom inquiries might be made, and yet no questions were asked.

As stated in the case of *French* v. *Freeman,* 191 Cal. 579 [217 Pac. 515, 518], the fact that the plaintiff visited the premises might properly, in this case, be held immaterial on the theory that the plaintiffs, at the time of the visit, were unable to judge of the quality and character of the soil. In the opinion of the case just referred to, we find the following: "If the defrauded party is not competent to judge the quality of the land, we do not see that it can make any difference whether or not he actually visited the premises. Assuming that if plaintiff had not visited the premises he would be entitled to rely upon the representations, it would be unreasonable to say that he would not likewise be entitled to rely upon the representations, even though he visited the land, if, as a matter of fact, by reason of his inexperience and ignorance, he was incompetent to judge the quality of the soil." In the instant case, however, admitting that the plaintiffs were ignorant, for the purposes of the argument, it is apparent that they were advised of what they complain as the "inherent defect" in the land, to wit, the presence of hard-pan, and yet, according to their statements, made no inquiries until some time during the year 1926. There is nothing in the record which shows that the plaintiffs were lulled into inactivity by any act of the defendant, from the time they left the Rio Linda district until the alleged awakening of their suspicions in the summer of 1926. The complaint alleges that lands were sold to others in the same district for the same price, but there is nothing in the testimony or in the pleadings showing that the defendant practiced any concealment in this case relative to the existence of hard-pan, the defect alleged to render the tract valueless. Nor is the statement of the agent of the company, Brennan, that all they needed to do before setting out the trees was to blast the hard-pan, proven to be false.

The case of *Nichols* v. *Moore,* 181 Cal. 131 [183 Pac. 531], an instance of where a number of years intervened between the perpetration of the fraud and the discovery thereof, is readily distinguishable from the facts involved herein. There the plaintiff was living in the state of Ohio; the lands involved were situate in Washington in a timber district; were represented by the defendant to be covered with

a valuable growth of timber available to navigation, etc. The plaintiff knew of the surrounding territory being covered with timber, but did not know that the particular tract involved had been completely denuded by fires. These were facts which were concealed and could not be readily ascertained by the plaintiff, and were not ascertained until an agent was sent by her to examine the premises. Even in that case the opinion holds that it is necessary for the parties seeking to avoid the statute of limitations to affirmatively plead facts excusing the failure to make an earlier discovery of the fraud relied upon. This, in the event of a lapse of more than three years. It is likewise held that ignorance of the fact which a party might, with reasonable diligence, have discovered, is not sufficient to postpone the running of the statute.

In *Phelps* v. *Grady*, 168 Cal. 73 [141 Pac. 926], it is held that: "A party seeking to avoid the bar of the statute on account of fraud, must aver and show that he used due diligence to detect it. . . . Concealment which will avoid the statute must go beyond mere silence. It must be something done to prevent discovery. Concealment must be the result of positive facts. Concealment by mere silence is not enough. There must be some trick or contrivance intended to exclude suspicion and prevent inquiry. The circumstances of the discovery must be fully stated and proved and the delay which has occurred must be shown to be consistent with the requisite diligence." As the record shows, nearly three years elapsed without the plaintiffs taking any act whatever, or making any inquiry. In other words, the record shows no diligence and no effort to ascertain what they alleged to be the truth concerning the lands involved, and likewise exhibits no act on the part of the defendant, as shown by the case of *Phelps* v. *Grady, supra,* necessary to exist in order to constitute an excuse for inactivity on the part of the plaintiffs.

The instant case is, in its essential particulars, similar to the circumstances involved in *Sacramento Suburban Fruit Lands Co.* v. *McNair,* 36 Fed. (2d) 950, where it was held that the testimony showed a case which was barred by the statute as a matter of law. In that case the plaintiff testified as to the discovery of hard-pan, but he did not know what it was; that he finally moved off the premises for the lack of money;

that he never talked with anyone about fruit growing, and made no inquiries concerning the land, just as characterizes the actions of the Laytons in the case at bar.

From the foregoing we can find no escape from the conclusion that there is no testimony showing due diligence on the part of the Laytons, nor any excuse therefor, and that the finding of the trial court to such effect is without support.

Is the defense of the statute of limitations available to the defendant in this action? The complaint alleges, and the answer admits, that the defendant is a Minnesota corporation and therefore must comply with the act of the legislature requiring the filing with the secretary of state of the designation of some person upon whom service of summons may be made. While the answer of the defendant did not plead the filing of such a designation, as required by the statute, it appears that the defendant did introduce, and there was admitted in testimony, an instrument showing such designation filed with the secretary of state on the twelfth day of August, 1912. While the admission of this writing was objected to as being incompetent and immaterial, it was not objected to as not being within the issues tendered by the pleadings, and must therefore be considered as though properly pleaded. Following this a stipulation was made in the following words: "It is hereby stipulated that the A. M. Jones referred to in the designation filed with the secretary of state resigned from defendant's employ in the year 1914, and since such time has not been connected with the defendant in any capacity. Dated, the 18th day of June, 1929." Counsel for the respective parties stated to the court that it was not intended by the stipulation to include anything further than that A. M. Jones had resigned from his employment, and that the stipulation did not include anything relative to his designation as a person upon whom service of summons might be made. The designation filed with the secretary of state gave the residence at the time of the resignation of A. M. Jones as Sacramento, California. At the date of the trial, and at the time of the stipulation, and for some years prior thereto A. M. Jones had been residing in the city of Fresno, Fresno County. It is the contention of the respondent that when A. M. Jones, the designated agent upon whom service

might be made, resigned from his employment and left the city of Sacramento, going first to one of the northern cities in the state and finally locating in Fresno, he had in legal effect severed his designation as the company agent, and had worked an abandonment thereof so that the further running of the statute of limitations in behalf of the company had ceased. In support of this contention the respondent cites the cases of *Gerrick & Gerrick Co.* v. *Llewellyn Iron Works*, 105 Wash. 98 [177 Pac. 692], and *Brown-Ketchem Iron Works* v. *J. B. Swift Co.*, 53 Ind. App. 630 [100 N. E. 584.] In both of these cases there was involved the abandonment of the agency, and the removal of the corporation from the state. Service of summons was had upon the designated agent after the abandonment and after the withdrawal of the corporation from the state where the designation had been filed. The service of summons in both cases was held invalid and insufficient to give the trial court jurisdiction. Here we have the corporation still doing business in the state. The statute relative to designation of an agent upon whom service may be made, at the time the designation was filed, did not require that the residence of the designated agent should be in any particular place, or even should be stated in the designation, other than that he should be a resident of the state of California, and in the event that the designated agent died or departed from the state, the corporation making the designation should, within forty days thereafter, file another designation; otherwise, the statute would cease to run. The statutes as now amended, requiring residence, etc., to be given, have no application. The statute specifies only one condition for stopping the running of the statute, to wit, the failure to file a new designation within forty days after the departure or death or removal from the state of the person theretofore designated. Under no other circumstances does the statute cease to run. The mere fact that the designated agent moves from one place to another within the state has no effect upon the operation of the statute. The statute of limitations is a creature of the legislature, and the legislature alone has power to fix the conditions under which it may operate, and also the circumstances necessary to suspend the running of the statute. Where the corporation has abandoned its business within the state and retired therefrom, the court

might very well be justified in holding that during the absence of the corporation from the state the statute ceases to run, just as in the case of individuals who absent themselves from the state, the time of such absence is no part of the statutory period constituting a bar. When the corporation has an office within the state and a managing agent or any officer therein, as named in subdivision 2 of section 411 of the Code of Civil Procedure, summons may be readily served. In fact, such appears to have been the procedure followed in the cases presented upon this appeal. Again, the cases cited by the respondent by reason of the fact that the corporation had retired from the state where the questions arose, are inapplicable. ██ Further, it is not necessary that the designated agent be an employee or officer of the company. When such designation is made, and the designation appears on file in the office of the Secretary of State, service of summons may be made upon such designated agent, even though in fact such person had no connection with the corporation, and had considered himself no longer such agent. This is the substance of the holding in the case of *Eureka L. & Y. Co.* v. *Superior Court*, 66 Cal. 311 [5 Pac. 490]. The facts in that case show that one David Cahn, while an officer of the company, had been designated as the person upon whom service might be made. The following quotation shows the facts and the ruling of the court: "In the action in which the injunction was issued, the summons was served by the sheriff of the City and County of San Francisco, on the 9th day of November, 1882, by delivering a copy of the same, together with a certified copy of the complaint, to said David Cahn. On motion of petitioner to set aside the return of service of summons, affidavits were read in support of the motion, to the effect that at the time of the service one A. S. Bigelow, of the County of Nevada, was its managing agent, and said Cahn was not, and had not been for more than a year prior thereto, the agent, cashier, secretary or other officer of the petitioner. In regard to this point it is sufficient to say that the petitioner had, under the statute of April 1, 1872, designated Cahn as the person upon whom process might be served, and such designation had not been revoked at the time of the service. This designation was made after the amendment of 1874, to section 411 of the Code of Civil Procedure, and the peti-

tioner could not be heard to say, in the suit for injunction, that Cahn was not the proper person, as designated in subdivision 2 of section 411. . . . To hold otherwise would be to permit a foreign corporation to set at defiance, all processes.'' If, under such circumstances, a corporation is estopped from denying the validity of the service of summons upon a designated agent, so long as no change had been made by filing the necessary papers with the Secretary of State, it follows as a matter of course that the corporation is not estopped to plead the statute. The weight of authority is that the statute having provided a method of notifying the public of a change of agency, the designation continues until the specified procedure is followed.

In *S. B. Reese Lumber Co.* v. *Licking Coal & Lumber Co.*, 156 Ky. 723 [161 S. W. 1124], the Supreme Court of Kentucky, in dealing with a like question, held as follows: ''Under Ky. St. Sec. 571, providing that all foreign corporations shall have a known place of business and an authorized agent upon whom process may be served, and that it shall not be lawful for any corporation to carry on business until it shall have filed in the office of the Secretary of State a statement giving the location of its office and the name of its agent, and, if the agent shall be changed, notice shall at once be given, service of process on one who appeared as agent in the statement filed with the Secretary of State is a good service on a foreign corporation, even though the agency had been terminated.''

In *Germantown* v. *McCallum*, 223 Pa. 554 [72 Atl. 885], the Supreme Court of Pennsylvania held that the statute ''did not require that the registered agent of a foreign corporation should stand in any other relation to it than its agent upon whom process might be served, and notwithstanding such agent had parted with his interest in the corporation or had resigned his office as secretary and treasurer, he remained its agent upon whom process might be served.''

In *De La Vergne Refrigerating Machine Co.* v. *Kolischer*, 214 Pa. 400 [63 Atl. 971], it was held that the designated agent remained such until his appointment was canceled in the manner provided by the statute.

In the case of *Gibson* v. *Manufacturers Fire & Marine Ins. Co.*, 144 Mass. 81 [10 N. E. 729], the Supreme Court, in

considering a like question, held that the appointment of an agent was irrevocable unless the revocation be made by the appointment, duly notified upon the public records, of a new agent, who should be competent to receive service of process.

We see no escape from the conclusion that so long as the defendant in this case was doing business in this state, and under the authorities which we have cited, estopped from denying the authority of its designated agent to accept service, if such an issue were presented, it is likewise entitled to the benefit of the statute. In other words, the estoppel to deny is equivalent to holding that the statute of limitations never ceased to run. It may be further observed that there is nothing in the record indicating an intent or purpose, on the part of the defendant, to revoke or abandon the designated agency.

In view of what we have said, the order of the court must be and is as follows:

The judgment in the case of J. S. Stevens and Esther Stevens against the defendant is affirmed. The judgment of N. E. Isenberger against the defendant is likewise affirmed. And the judgment of John R. Layton and Louise S. Layton against the defendant is reversed.

Petitions for rehearing of these causes were denied by the District Court of Appeal on November 21, 1930, and petitions by appellant in Civ. Nos. 4142, 4143 and 4144, and by respondents in Civ. No. 4143, to have these causes heard in the Supreme Court, after judgment in the District Court of Appeal, were denied by the Supreme Court on December 20, 1930.