Joan L. MYRICK and Bruce A. Myrick

v.

John A. JAMES, M. D.

Supreme Judicial Court of Maine.

Argued Sept. 18, 1981.

Decided May 4, 1982.

E. Stephen Murray (orally), Murray, Plumb & Murray, Ellyn C. Ballou, Portland, for plaintiffs.

Hunt, Thompson & Bowie, James M. Bowie (orally), M. Roberts Hunt, Portland, for defendant.

Before McKUSICK, C. J., GODFREY, NICHOLS, CARTER, VIOLETTE and WATHEN, JJ., and DUFRESNE, A. R. J.

CARTER, Justice.

In *Tantish v. Szendey*, 158 Me. 228, 182 A.2d 660 (1962), this Court held that a foreign-object surgical malpractice action accrues, for the purpose of determining when the statute of limitations commences, at the time of the negligent act. In so holding, we conformed to the then contemporary weight of authority and expressly rejected the proposition that such an action accrues only when the patient becomes aware or has reason to be aware of the physician's alleged failure to remove the foreign-object from his body in the course of surgery. For the reasons set forth herein, we overrule our holding in *Tantish* and adopt the discovery rule in foreign-object surgical malpractice cases.

## I. Facts

On December 31, 1980, the plaintiffs commenced a surgical malpractice action against the defendant, an obstetrician and gynecologist. In their verified complaint, the plaintiffs allege that the defendant performed a partial hysterectomy on the plaintiff Joan L. Myrick on May 17, 1973. Immediately following the operation, Joan Myrick was affected by the onset of significant physical symptoms. She alleges that she sought assistance from other medical practitioners, including a psychiatrist, but none of them was able to alleviate the symptoms arising after the May 1973 operation. In December 1979, a physician other than the defendant suggested that she undergo exploratory surgery. The defendant performed this subsequent operation on January 10, 1980, and he found and removed a surgical sponge from her abdomen. She alleges that this sponge was improperly allowed to remain in her body at the conclusion of the prior surgery by the defendant. Much of her symptomatology is alleged to have disappeared shortly after this operation.[1]

The defendant sought dismissal of this malpractice action on the ground that, under *Tantish*, the plaintiff's action accrued on the date of the operation, May 17, 1973. Because a suit arising from these facts is subject to a two-year period of limitations pursuant to 14 M.R.S.A. § 753,[2] he asserted that the plaintiffs were barred from bringing this action. Relying on the precedential effect of *Tantish*, the Superior Court, Androscoggin County, granted the defendant's motion and dismissed the complaint. The plaintiffs appeal from this dismissal. We sustain the appeal by overruling *Tantish* and holding that a foreign-object surgical malpractice case accrues under section 753 when the plaintiff discovers or reasonably should discover the presence of the foreign object in her body.

## II. Interference With The Legislative Prerogative

In section 753, we are faced with a statute which does not specify when the two-year period of limitations commences to run; the Legislature has not provided a definition of "accrues" applicable to foreign-object surgical malpractice suits. Absent any "explicit legislative direction" which would otherwise foreclose our consideration of the meaning of "accrual," the process of defining the term remains a judicial function. *Anderson v. Neal*, Me., 428

---

1. A separate count of the complaint alleges that the surgery commenced in May 1973 was not completed until January 1980 when the second operation was performed. The third count, brought by Bruce Myrick, Joan's husband, sought judgment for his wife's medical expenses and his loss of consortium.

2. In full, § 753 provides: "Actions for assault and battery, and for false imprisonment, slander, libel and malpractice of physicians and all others engaged in the healing art shall be commenced within 2 years after the cause of action accrues."

A.2d 1189, 1191 (1981); *Neel v. Magana, Olney, Levy, Cathcart & Gelfand,* 6 Cal.3d 176, 192, 491 P.2d 421, 431, 98 Cal.Rptr. 837, 847 (1971); *Franklin v. Albert,* 381 Mass. 611, ——, 411 N.E.2d 458, 462 (1980); *Shillady v. Elliot Community Hospital,* 114 N.H. 321, 323–24, 320 A.2d 637, 639 (1974); *Fernandi v. Strully,* 35 N.J. 434, 448–49, 173 A.2d 277, 285 (1961); *Morgan v. Grace Hospital, Inc.,* 149 W.Va. 783, 789, 144 S.E.2d 156, 160 (1965). *See Williams v. Ford Motor Co.,* Me., 342 A.2d 712, 714 (1975). *Cf. Laughlin v. Forgrave,* 432 S.W.2d 308 (Mo. 1968) (construing a statute providing that medical malpractice actions be brought "within two years from the date of the act of neglect complained of"). Particularly as the statute of limitations implicates a technical legal procedure, and as the term "accrual" is regarded as an "obscure . . . legislative phraseology," courts have been held to be peculiarly suited to examine the meaning and application of the statute. *Neel,* 6 Cal.3d at 192, 491 P.2d at 431, 98 Cal.Rptr. at 847; *Fernandi,* 35 N.J. at 448–49, 173 A.2d at 285.

The defendant asserts that the legislative activity following our decision in *Tantish* must be characterized as a ratification of the construction imposed by that case on the statute of limitations applicable to foreign-object surgical malpractice actions, and that we are thereby forbidden from re-examining that holding today. The issue of the statute of limitations in such cases has been raised in the Legislature three times since *Tantish* was decided.[3] In 1963, Leg.Doc. 1581, amending Leg.Doc. 1352, was introduced to create a two year statute of limitations which would commence when the injury is first sustained, discovered, or should have been discovered with the exercise of reasonable care; the bill also would have imposed an ultimate limitation of four years from the date of the negligent act. This proposal was indefinitely postponed.

The 104th Legislature considered a similar two year statute of limitations which would have invoked the discovery rule in actions for medical malpractice. The Judiciary Committee unanimously recommended passage of the bill with an amendment imposing a ceiling of six years from the date of the negligent act. The House passed the measure, 1969 Leg.Rec. 2863, but the Senate voted for its indefinite postponement. *Id.* 3013. The proposal subsequently died when the members of a joint committee, established to explore the possibility of reconciling the two legislative branches, reported that they were unable to agree on the matter. *Id.* 3983. *See also id.* 2397–2402.

Finally, in P. & S.L.1975, ch. 73, the Legislature created the Commission to Revise the Laws Relating to Medical and Hospital Malpractice Insurance, an entity popularly known as the Pomeroy Commission, charged with formulating proposals "to insure the availability of medical and hospital malpractice insurance to physicians and hospitals . . . and to develop a more equitable system of relief for malpractice claims." *Id.,* § 1. The fruits of the Committee's report were enacted in 1977 as the Maine Health Security Act, 24 M.R.S.A. §§ 2501–2905. Included in the Act was a statute of limitations applicable to tort actions against a hospital or its employees. § 2902. This provision removed such actions from the purview of the general six year limitations statute, 14 M.R.S.A. § 752, and situated them in a position similar to malpractice actions against physicians, as provided in section 753. Statement of Fact at 21, Leg. Doc. 727 (108th Leg., 1977).

During the Legislature's consideration of the Pomeroy Commission Report, four separate amendments were offered which would have attached discovery features to both section 753 and the then pending section 2902 of the Health Security Act. House

---

**3.** Additionally, the statute of limitations at issue in *Tantish* was created in P.L.1931, c. 62. This section was recodified in 1964 without change and is now found in 14 M.R.S.A. § 753. The mere re-enactment of the same substantive provision does not constitute a legislative approval and adoption of this Court's constructions of it "to the extent necessary to foreclose judicial reconsideration of prior cases." *Anderson,* 428 A.2d at 1190. The 1964 re-enactment, then, does not by itself prevent us from re-examining *Tantish* today.

Filings 771, 780, 788 and 853. Only one of the four amendments (H.F. 788) reached the House floor, where it was indefinitely postponed. 1977 Leg.Rec. 2090–91. *See also id.* 1832–33, 1945–50.

Thus, the Legislature has on several occasions considered the adoption of a discovery rule applicable to foreign-object surgical malpractice suits, but it has never enacted such a provision. Several members of the body engaged in debate over the merits of such a provision. Yet, "no one knows why the Legislature did not pass the proposed measure." *Anderson*, 428 A.2d at 1191, *quoting Franklin*, 381 Mass. at ——, 411 N.E.2d at 461, *and Berry v. Branner*, 245 Or. 307, 311, 421 P.2d 996, 998 (1966). Indeed, as we further noted in *Anderson*, the

> legislative failure to give statutory recognition to a discovery rule may have resulted from the "belief that the matter should be left to be handled by the normal processes of *judicial development of decisional law*, including the overruling of outstanding decisions to the extent that the sound growth of the law requires."

428 A.2d at 1191, *quoting Franklin*, 381 Mass. at ——, 411 N.E.2d at 461–62, *and* H. Hart & A. Sacks, *The Legal Process: Basic Problems in the Making and Application of Law* 1395–96 (tent. ed. 1958) (emphasis added). *See also Neel*, 6 Cal.3d at 192, 491 P.2d at 431, 98 Cal.Rptr. at 847.

Significantly, even in the face of these proposals to implement the discovery rule in medical malpractice cases, the Legislature has not adopted the holding in *Tantish* that a cause of action for surgical malpractice accrues at the time of the occurrence of the negligent act. Thus, ultimately, we are faced with a silent legislative record which cannot be seen to either endorse or reject the discovery rule in the factual context presented by this case. It is an invalid mode of analysis to evaluate the judicial soundness of *Tantish* by the absence of subsequent legislation. Such legislative inaction cannot be viewed as a rejection of the

discovery rule so as to preclude our examination of it ourselves. *See Girouard v. United States*, 328 U.S. 61, 69–70, 66 S.Ct. 826, 829–30, 90 L.Ed. 1084, 1090 (1946), *quoted in N.L.R.B. v. Plasterers' Local Union No. 79*, 404 U.S. 116, 129–30, 92 S.Ct. 360, 368–69, 30 L.Ed.2d 312, 323 (1971). Nor can such inaction be taken as indicative of any intent to in fact legislate the rule previously developed by the court through construction of the generic statutory language. *See James v. United States*, 366 U.S. 213, 220, 81 S.Ct. 1052, 1056, 6 L.Ed.2d 246, 254 (1961); *Girouard*, 328 U.S. at 69–70, 66 S.Ct. at 829–30, 90 L.Ed. at 1090; *Helvering v. Hallock*, 309 U.S. 106, 119–20, 60 S.Ct. 444, 451–52, 84 L.Ed. 604, 612–14 (1939).

In two instances, the Legislature has enacted a form of the discovery rule. These include malpractice actions against design professionals, 14 M.R.S.A. § 752–A, and causes of action fraudulently concealed, 14 M.R.S.A. § 859.[4] However, "[t]he legislative recognition of the need for a discovery rule of accrual in certain situations ... does not preclude this Court from giving judicial recognition to such a need in others." *Anderson*, 428 A.2d at 1190. *Christiansen v. Rees*, 20 Utah 2d 199, 202, 436 P.2d 435, 437 (1968). Unlike actions within the scope of sections 752–A and 859, the Legislature has left undefined when a cause of action subject to section 753 accrues. In the face of the specific intent displayed by the Legislature in sections 752–A and 859, we cannot validly infer from its silence as to section 753 suits an affirmative mandate establishing a point of accrual.

■ There thus exists no "explicit legislative direction" to divest this Court of its responsibility to define when a foreign-object surgical malpractice action accrues under section 753. In exercising this power, we do not encroach on legislative prerogatives any more than we did in issuing our holding in *Tantish*. By that decision, we closed the doors of our courtrooms to plaintiffs governed by the harsh accrual rule.

---

**4.** *See also* 39 M.R.S.A. § 95, extending the time in which an employee may file a claim for workers' compensation when the claimant suffers "a mistake of fact as to the cause and nature of the injury."

We did that without legislative help. We can likewise open them again, without legislative help, when principled articulation of just principles of law in the existing social environment shall so require. *See Molitor v. Kaneland Community Unit District No. 302,* 18 Ill.2d 11, 25, 163 N.E.2d 89, 96 (1959), *cert. denied* 362 U.S. 968, 80 S.Ct. 955, 4 L.Ed.2d 900 (1960); *Pierce v. Yakima Valley Memorial Hospital Association,* 43 Wash.2d 162, 166–67, 260 P.2d 765, 768 (1953). Where the policy at issue is one "originally fashioned by the court" it remains the "primary responsibility" of judges to change that policy however long it has persisted, *MacDonald v. MacDonald,* Me., 412 A.2d 71, 73–74 (1980), when it operates erratically and "produces undesirable results in frequently recurring kinds of situations." *Black v. Solmitz,* Me., 409 A.2d 634, 639 (1979).[5]

That which we may not do is to change such a rule or policy once the Legislature has specifically taken that rule or policy out of the arena of the judicial prerogative, in which it originally placed it, by a positive and definitive statutory pronouncement, legitimately within its own prerogative, of a specific rule or policy. As we have demonstrated, that has not happened with respect to the accrual rule we enunciated in *Tantish.* We have said with respect to this rationale as used in a past similar case, *Potter v. Schafter,* 161 Me. 340, 211 A.2d 891 (1965), that the Court's refusal there to act, thus deferring to the Legislature, was "wrong in theory . . . [and] in its intimations that action by the judiciary to change the common law where there is involved a 'collision between the principle of *stare decisis* and contemporary legal philosophy' is 'to usurp legislative authority.'" *MacDonald,* 412 A.2d at 74 n.4. Having once surmounted that doctrinal error, we should not again commit it in this case.[6] It is a legitimate judicial function to make law

---

**5.** *Black* overruled *Downs v. Poulin,* Me., 216 A.2d 29 (1966), thereby limiting application of the doctrine of parental immunity.

**6.** The seminal lesson to be derived from the Court's experience in deferring to legislative action in regard to the abrogation of the sovereign immunity doctrine is instructive for purposes of assessing the validity of any contention that may be made that we should defer to future legislative action in achieving change in this court-made rule of law. In 1961, the Court stated that the doctrine had "served its purpose and ought to be destroyed." *Nelson v. Maine Turnpike Authority,* 157 Me. 174, 186, 170 A.2d 687, 693 (1961). It refused to accomplish the indicated destruction, deferring, for that purpose, to legislative action. *Id.* Eleven years later, sovereign immunity still being in place, the Court stated flatly that "application of the so-called doctrine has been incorrect and its application cannot withstand the test of logic." *Bale v. Ryder,* Me., 286 A.2d 344, 345 (1972). Despite what has been described as *Bale's* "clear repudiation of the rule", *Davies v. City of Bath,* Me., 364 A.2d 1269, 1270 (1976), the Court refused again to abrogate sovereign immunity by judicial *fiat,* deferring to the Legislature. A year later the Court again refused, awaiting legislative action, to abrogate what was acknowledged to be "this court made legal rule." *Bartashevich v. City of Portland,* Me., 308 A.2d 551 (1973). In spite of some legislative activity, the doctrine, then in such a deep state of judicial disrepute with this Court, remained legislatively unimpaired in its essential vitality. Finally, in 1976, pressed to the limit of its patience, the Court abrogated, subject to remedial legislation within sixty-three days of its Opinion, the doctrine it had then deprecated with consistency for fifteen years. *Davies,* 364 A.2d 1269. By that time the Court could accurately describe the doctrine as having "been so discredited that an overwhelming majority of jurisdictions has abolished it either by judicial decision or by statute." *Id.* at 1272 (footnote omitted). Of the twenty-three decisions from as many jurisdictions cited by the Court in support of that description, all but three were of more recent vintage than 1961, when the Court first recognized in *Nelson* that the doctrine "ought to be destroyed." *See Davies, id.* 364 A.2d at 1272 n.8.

The end result of the Court's tender solicitude for what was conceived to be the legislative prerogative in that situation was that a judge-made rule of the common law, *Bale,* 286 A.2d 344, was imposed upon the citizens of this State for fifteen years after the time this Court recognized, on principled analysis and considerations of fundamental fairness, that it was archaic, irrational and deserving of destruction, while the courts of at least twenty other jurisdictions acted to relieve the citizenry of those jurisdictions from the burden of the erroneous and unfair rule. One such experience should be enough to convince any court of its responsibility to tend to the care and pruning of the perennials of its own garden. It has never been demonstrated that when the Court finally did act to abrogate the doctrine any great calamity

interstitially by giving meaning through judicial interpretation to vague, indefinite or generic statutory terms "that alone are but the empty crevices of the law." *Linkletter v. Walker,* 381 U.S. 618, 624, 85 S.Ct. 1731, 1734, 14 L.Ed.2d 601, 605 (1965).

[T]he fact that Congress has remained silent or has re-enacted a statute which we have construed, *or that congressional attempts to amend a rule announced by this Court have failed,* does not necessarily debar us from re-examining and correcting the Court's own error.

*James,* 366 U.S. at 220, 81 S.Ct. at 1056, 6 L.Ed.2d at 254 (emphasis added); *accord, Girouard,* 328 U.S. at 69–70, 66 S.Ct. at 829–30, 90 L.Ed. at 1090; *Helvering,* 309 U.S. at 119–22, 60 S.Ct. at 451–53, 84 L.Ed. at 612–14. Where the Legislature has once left to the courts the performance of that definitional function the judicial prerogative remains open, as circumstances require, for re-interpretation in light of changed conditions, so long as the Legislature does not preempt the pertinent statutory meaning by its own definitive and legitimate pronouncement. *See Lewis v. Lewis,* 370 Mass. 619, 626, 351 N.E.2d 526, 531 (1976); *MacDonald,* 412 A.2d at 73–74, and cases therein cited. Reconsideration of a prior precedent settling a question of statutory construction is proper where there is nothing in subsequent legislative history sufficient to persuade us that the legislative branch intended *to legislate the rule.*

### III. *The Merits of the Two Rules*

A discovery rule not unlike the one proposed by the instant plaintiffs was adopted

by the Court and held applicable to allegedly negligent title searches, in *Anderson v. Neal,* Me., 428 A.2d 1189 (1981). The statute of limitations applicable to such actions, found in 14 M.R.S.A. § 752, does not specify *when* the cause of action accrues and thus when the period of limitations commences. In the absence of explicit legislative direction identifying that moment, we held it proper for this Court to determine when the action accrues by construction of the statute. 428 A.2d 1190–91. Our subsequent examination of the merits of the discovery rule within the factual setting of that case included a recognition of the fiduciary relationship between the client and that attorney who performed the title search, the magnitude of the loss resulting from the attorney's asserted negligence, and the inherently undiscoverable nature of the tort absent an independent investigation destructive of the confidential relationship between the client and attorney. *Id.* at 1191–92. The Court finally noted that the Legislature has itself sanctioned the discovery rule in 14 M.R.S.A. § 752–A, establishing the statute of limitations for malpractice actions against design professionals, and in 14 M.R.S.A. § 859, tolling the statute of limitations until the aggrieved party has become aware of the existence of a fraudulently concealed cause of action. 428 A.2d at 1192. Upon these considerations, we concluded that "a cause of action based on an allegedly negligent title search accrues at the time the plaintiff discovers, or reasonably should have discovered, his injury." *Id.*[7]

ensued from its action. Sixty-two days after the issuance of the opinion in *Davies,* the Legislature enacted the Maine Tort Claims Act, 14 M.R.S.A. §§ 8101–8118, and the Court, the Legislature and the public went on their way, the public, at least, the better off for the Court's action having finally occurred. Never was there better proof of the validity of Justice Cardozo's observation that in the making of progress "we are to beware of the insularity of mind that perceives in every inroad upon habit a catastrophic revolution." Cardozo, *The Paradoxes of Legal Science* 121 (1928). The lesson to be learned from the experience is that where change is required due to obsolescence in

court-made rules of law, and where such change may create lacunae in the legal matrix which the Legislature is peculiarly well-equipped to address, the surest and swiftest means to assure progress is for common-law judges to confidently act on their responsibility to abrogate their own work product when reason proves its invalidity.

7. We said in *Anderson* that "[t]he principles we here apply may require a re-examination of *Tantish v. Szendey* ... in the medical malpractice area when the issue is properly before us." 428 A.2d at 1193.

■ As a general proposition, however, in this jurisdiction, a cause of action in tort is deemed to accrue when the plaintiff sustains a judicially cognizable injury: the moment when a wrongful act produces an injury for which the plaintiff is entitled to seek judicial vindication. *Bozzuto v. Ouellette*, Me., 408 A.2d 697, 699 (1979); *Williams v. Ford Motor Co.*, Me., 342 A.2d 712, 714 (1975); *Betts v. Norris*, 21 Me. 314, 319 (1840). *See Anderson*, 428 A.2d at 1191. In *Tantish*, the defendant-physician performed surgery on the plaintiff in September 1956. In the course of the operation, the defendant failed to remove some tubing from the plaintiff's body, and the plaintiff did not become aware of its presence until July 1958. Her action, commenced in July 1960, was dismissed as barred by the two-year statute of limitations.[8] On appeal, this Court confirmed the application of the general accrual rule to surgical malpractice cases, holding that the statute of limitations began to run at the time of the negligent act, *i.e.*, the operation, notwithstanding the plaintiff's discovery of the negligent quality of that act at a later point. This result, the Court noted, was consistent with the then contemporary weight of authority which subordinated the "possibility of hardship" suffered by a blameless plaintiff with a meritorious claim, to the importance of creating "repose and security" in those who would otherwise face stale claims and the consequential difficulties of proof. 158 Me. at 230–31, 182 A.2d at 661.

The formulation of a statute of limitations represents a balance of several competing interests. First, parties injured by the actions of others must be afforded an opportunity to pursue their meritorious claims and seek relief in the courts. On the other hand, potential defendants are entitled to eventual repose and to protection from being required to meet claims which could have been addressed more effectively

if asserted more promptly. Difficulties in defending stale claims are caused by faded memories, dead or otherwise unavailable witnesses, and lost or destroyed evidence. *United States v. Kubrick*, 444 U.S. 111, 117, 100 S.Ct. 352, 357, 62 L.Ed.2d 259, 266 (1979); *Williams*, 342 A.2d at 713; *Franklin*, 381 Mass. at ——, 411 N.E.2d at 463. *See generally Developments in the Law— Statutes of Limitation*, 63 Harv.L.Rev. 1177, 1185 (1950). Additionally, several courts have attributed to statutes of limitations the function of filtering out those claims which are spurious, inconsequential, and unfounded, because meritorious claims "are not usually allowed to remain neglected." *Riddlesbarger v. Hartford Insurance Co.*, 74 U.S. (7 Wall.) 386, 390, 19 L.Ed. 257 (1868), *quoted in Flanagan v. Mount Eden General Hospital*, 24 N.Y.2d 427, 429– 30, 248 N.E.2d 871, 872, 301 N.Y.S.2d 23, 25 (1969). *Accord, Shinabarger v. Jatoi*, 385 F.Supp. 707, 709–10 (D.S.D.1974); *Spath v. Morrow*, 174 Neb. 38, 39–43, 115 N.W.2d 581, 583–84 (1962); *Ruth v. Dight*, 75 Wash.2d 660, 663, 453 P.2d 631, 634 (1969). The intended effect, then, of statutes of limitations is to stimulate activity and to punish negligence and slumber. *Wood v. Carpenter*, 101 U.S. 135, 139, 25 L.Ed. 807, —— (1879), *quoted in Franklin*, 381 Mass. at ——, 411 N.E.2d at 463; *Fernandi*, 35 N.J. at 437, 173 A.2d at 279; *Berry*, 245 Or. at 312–13, 421 P.2d at 999.

Justice Jackson of the United States Supreme Court accurately synthesized the nature, purpose and effect of statutes of limitation when he said:

Statutes of limitation find their justification in necessity and convenience rather than in logic. They represent expedients, rather than principles. They are practical and pragmatic devices to spare the courts from litigation of stale claims,

---

8. We note that the plaintiff discovered the presence of the tubing in her back before the two year period of limitation, commencing at the time of the surgery in September 1956, had expired. Because, however, she instituted the malpractice action within two years of discovering the foreign object and not within two

years of the operation itself, her suit would be timely only if the cause of action was deemed to have accrued at the moment she became aware that the defendant had left the tubing in her. The Court was thus faced squarely with the question of whether to adopt such a rule.

and the citizen from being put to his defense after memories have faded, witnesses have died or disappeared, and evidence has been lost.... They are by definition arbitrary, and their operation does not discriminate between the just and the unjust claim, or the avoidable and unavoidable delay. They have come into the law not through the judicial process but through legislation. They represent a public policy about the privilege to litigate. Their shelter has never been regarded as what now is called a "fundamental" right or what used to be called a "natural" right of the individual. *Chase Securities Corp. v. Donaldson*, 325 U.S. 304, 314, 65 S.Ct. 1137, 1142, 89 L.Ed. 1628, 1635–36 (1944) (footnote omitted). It must be recognized that the interests secured by a statute of limitations are procedural in nature and cut against those interests provided by a full and uniform application of rules of substantive law and the adjudication of cases on the merits. *See Dishon v. Oliver*, Me., 402 A.2d 1292, 1294 (1975); *Miller v. Fallon*, 134 Me. 145, 147, 183 A. 416, 417 (1936).

While the accrual rule successfully promotes the purposes underlying the statute of limitations in most instances, see *Anderson*, 428 A.2d at 1191, it works a manifest injustice in foreign-object surgical malpractice cases such as this where a patient, through no personal fault or failure of diligence, is unaware that her sutures hide a foreign object, until the two year period in which to bring an action has elapsed. As the *Anderson* court found in the context of an attorney examining the title to realty for the benefit of a client, there here exists a "specific complex of interests" which undermines the capacity of the general accrual rule to effect just and sound results in foreign-object surgical malpractice actions.

The inherent complexity of symptomatology and subsequent diagnosis places the plaintiff-patient in this specific type of case in a position of blameless ignorance as to the cause of her malady and suffering. *Franklin*, 381 Mass. at ——, 411 N.E.2d at 463; *Shillady*, 114 N.H. at 322, 320 A.2d at 638; *Fernandi*, 35 N.J. at 450, 173 A.2d at 286; *Gaddis v. Smith*, 417 S.W.2d 577, 578 (Tex.1967). *Cf. Bozzuto*, 408 A.2d at 699 (conversion action); *Williams*, 342 A.2d at 716 (products liability action); *Betts*, 21 Me. at 319 (action against sheriff for failure to attach sufficient property to satisfy judgment). Typically, the presence of the foreign object is discovered only by means of a subsequent operation. *Johnson v. St. Patrick's Hospital*, 148 Mont. 125, 126, 417 P.2d 469, 470 (1966). Here, the plaintiff Joan Myrick alleges that she sought medical treatment, including psychiatric evaluation, in an attempt to diagnose her condition. These efforts proved unsuccessful, and the presence of the surgical sponge and its causal relation to debilitating effects were revealed only during an exploratory operation, performed more than six years after the initial surgery. Therefore, the presence of the foreign-object and thus the plaintiff's awareness of an act asserted to be negligent remained *unknown and unknowable* until, under *Tantish*, the plaintiffs were no longer entitled to bring a malpractice action to fruition.

The patient must repose great confidence and trust in her surgeon. She is utterly helpless during the surgical procedure and must rely absolutely on the satisfactory quality of the care provided to her. *Millett v. Dumais*, Me., 365 A.2d 1038, 1041 (1976); *Melnyk v. Cleveland Clinic*, 32 Ohio St.2d 198, 199, 290 N.E.2d 916, 917 (1972); *Ayers v. Morgan*, 397 Pa. 282, 289, 154 A.2d 788, 792 (1959). Similarly, the surgeon bears the responsibility for exercising the ultimate control, in a supervisory sense at the very least, for placing objects in and removing them from the patient's body during surgery. *Melnyk*, 32 Ohio St.2d at 199, 290 N.E.2d at 917; *Gaddis*, 417 S.W.2d at 580. The reliance placed by the patient on the quality of the surgical treatment, then, is necessarily absolute and irrevocable.

The general accrual rule cannot embrace these factors peculiar to and characteristic of foreign-object surgical malpractice actions, particularly as the loss occasioned by this tort can be catastrophic.

Rather, a sound and just balance of rights of the parties to this action requires a construction of section 753 tailored carefully to the unique circumstances underlying such cases. In accordance with the rule adopted in the overwhelming majority of jurisdictions,[9] we find a proper balance by holding that a foreign-object surgical malpractice action accrues under section 753 when the plaintiff discovers, or, in the exercise of reasonable care and diligence, should discover the presence of the foreign object in her body.

In this limited class of cases, the discovery rule accomodates the competing interests embodied in the statute of limitations. If the two-year period commences to run from the moment when the patient knows or reasonably should know that the defendant had permitted a foreign object to remain in her body, the plaintiff is given a reasonable opportunity, quantified in the statute, to assert her claim.[10] In this way, the validity of her action under section 753 is not predicated on the mere fortuitousness of such a discovery within the two-year period following the surgical operation.

Further, the very graphic and tangible basis for a foreign-object surgical malpractice action largely alleviates the difficulties in defending them. There is little likelihood of a high incidence of feigned, frivolous, or fraudulent foreign-object surgical malpractice claims. Such actions do not rest on matters of credibility, or on professional diagnosis, judgment, or discretion. *Billings v. Sisters of Mercy*, 86 Idaho 485, 495, 389 P.2d 224, 231 (1964); *Fernandi*, 35 N.J. at 450, 173 A.2d at 286; *Flanagan*, 24 N.Y.2d at 430–31, 248 N.E.2d at 872–73, 301 N.Y.S.2d at 26. Thus, implementation of the discovery rule in these cases does not

**9.** In the following cases, the discovery rule has been applied to foreign-object medical malpractice actions in the face of legislative silence: *Mayer v. Good Samaritan Hospital*, 14 Ariz.App. 248, 482 P.2d 497 (1971); *Huysman v. Kirsch*, 6 Cal.2d 302, 57 P.2d 908 (1936); *Rosane v. Senger*, 112 Colo. 363, 149 P.2d 372 (1944); *Puro v. Henry*, 32 Conn.Sup. 118, 342 A.2d 65 (1975); *Burke v. Washington Hospital Center*, 293 F.Supp. 1328 (D.D.C.1968); *Billings v. Sisters of Mercy*, 86 Idaho 485, 389 P.2d 224 (1964); *Mathis v. Hejna*, 109 Ill.App.2d 356, 248 N.E.2d 767 (1969); *Franklin v. Albert*, 381 Mass. 611, 411 N.E.2d 458 (1980); *Johnson v. St. Patrick's Hospital*, 148 Mont. 125, 417 P.2d 469 (1966); *Spath v. Morrow*, 174 Neb. 38, 115 N.W.2d 581 (1962); *Shillady v. Elliot Community Hospital*, 114 N.H. 321, 320 A.2d 637 (1974); *Fernandi v. Strully*, 35 N.J. 434, 173 A.2d 277 (1961); *Flanagan v. Mount Eden General Hospital*, 24 N.Y.2d 427, 301 N.Y.S.2d 23, 248 N.E.2d 871 (1969); *Melnyk v. Cleveland Clinic*, 32 Ohio St.2d 198, 290 N.E.2d 916 (1972); *Seitz v. Jones*, 370 P.2d 300 (Okl.1962); *Berry v. Branner*, 245 Or. 307, 421 P.2d 996 (1966); *Ayers v. Morgan*, 397 Pa. 282, 154 A.2d 788 (1959); *Shinabarger v. Jatoi*, 385 F.Supp. 707 (D.S.D.1974) (construing South Dakota law); *Gaddis v. Smith*, 417 S.W.2d 577 (Tex. 1967); *Christiansen v. Rees*, 20 Utah 2d 199, 436 P.2d 435 (1968); *Ruth v. Dight*, 75 Wash.2d 660, 453 P.2d 631 (1969); *Morgan v. Grace Hospital, Inc.*, 149 W.Va. 783, 144 S.E.2d 156 (1965). *See generally* Annot., 70 A.L.R.3d 7 §§ 1–6 (1976 & Supp.1980).

Statutes codifying the discovery rule in foreign-object medical malpractice cases include *Ala.Code* § 6–5–482 (1975); *Ariz.Rev.Stat.* § 12–564 (1982); *Ark.Stat.Ann.* § 34–2616 (1981); *Cal.Civ.Proc.Code* § 340.5 (West 1980); *Colo.Rev.Stat.* § 13–80–105 (1980); *Del.Code* tit. 18 § 6856 (1980); *Fla.Stat.* § 95.11(4)(b) (West 1981); *Ga.Code Ann.* § 3–1103 (1981); *Haw.Rev.Stat.* § 657–7.3 (1981); *Idaho Code* § 5–219(4) (1979); *Ill.Rev.Stat.* ch. 83, § 22.1 (Smith-Hurd 1980); *Iowa Code* § 614.1(9) (1981); *Kan.Stat.* § 60–513(a)(7)(c) (1976); *Ky. Rev.Stat.Ann.* § 413.140(2) (1980); *Md.Cts. & Jud.Proc.Code Ann.* § 5–109 (1974); *Mich.Stat. Ann.* § 600.5838 (1980); *Miss.Code Ann.* § 15–1–36 (1981); *Mo.Rev.Stat.* § 516.105 (1978); *Mont.Rev.Codes Ann.* § 27–2–205 (1981); *Neb. Rev.Stat.* § 44–2828 (1978); *Nev.Rev.Stat.* § 41A.097 (1979); *N.H.Rev.Stat.Ann.* § 507–C:4 (1979); *N.Y.Civ.Prac.* § 214–a (McKinney 1981); *N.C.Gen.Stat.* § 1–15(c) (1981); *N.D. Cent.Code* § 28–01–18(3) (1981); *Ohio Rev. Code Ann.* § 2305.11 (Baldwin 1982); *Okla. Stat.Ann.* tit. 76 § 18 (1980); *Or.Rev.Stat.* § 12.110(4) (1979); *R.I.Gen.Laws* § 9–1–14.1 (1981); *S.C.Code* § 15–3–545 (1981); *Tenn. Code Ann.* § 29–26–116 (1980); *Utah Code Ann.* § 78–14–4 (1979); *Vt.Stat.Ann.* tit. 12, § 521 (1981); *Wash.Rev.Code Ann.* § 4.16.350 (1979); *Wis.Stat.* § 893.55 (West 1981); *Wyo. Stat.* § 1–3–107 (1977).

**10.** Adoption of this rule avoids the unseemly possibility that plaintiffs who suffer post-operative complications but who are unaware of the cause of those complications will initiate a malpractice action against the surgeon merely to preserve the availability of a remedy. *See Spath v. Morrow*, 174 Neb. 38, 41, 115 N.W.2d 581, 584 (1962).

unduly impair the defendant's ability to meet the claim, when such impairment is balanced against the harsh effects which characteristically visit plaintiffs in actions of this kind.

■ Nor does the rule compromise the statutory objectives of stimulating the prompt assertion of claims and of punishing a lack of diligence in their pursuit. Because the two-year period created by section 753 runs from the time the plaintiff discovers or, in the exercise of reasonable care and diligence, should discover the presence of the object,[11] the plaintiff cannot needlessly delay instituting the action. The defendant will thus not be prejudiced by an assertion of a claim more untimely than the Legislature permits under section 753.

As evidenced by the allegations in this case, the existence of a cause of action for foreign-object surgical malpractice is almost always inherently unknowable until the occurrence of events subsequent to the surgery. In 14 M.R.S.A. §§ 752–A and 859, the Legislature has recognized that the "accrual of an undiscoverable cause of action from the time of injury works an injustice on injured plaintiffs." *Anderson*, 428 A.2d at 1192. Here, in the face of legislative silence as to the proper application of section 753 to the similarly undiscoverable action for foreign-object surgical malpractice, we extend that legislative solicitude to plaintiffs in actions of this kind.

### IV. *Stare Decisis Considerations*

A noted commentator has recently spoken of the difficulty encountered in attempting to extract firm guidelines from the decided cases that confront and decide in specific factual contexts whether to overrule precedent.

Perhaps it is easier to identify than to explain how to identify appropriate occasions and appropriate methods for overruling. Moreover, the advantages of the common law method over the statutory

method of developing law are relevant here: codifying guidelines on this subject would undoubtedly produce mistakes that could be avoided by feeling one's way along case by case.

It would be entirely consistent with the pursuit of this case-by-case method of developing guidelines, however, *for courts to be more candid and articulate about it.* At present one who seeks the sense of precedents on this question must do much reading between the lines. All too often, discussion has been almost exclusively limited to gross assertions either that lawmaking is for legislatures or that outmoded court-made rules ought to be corrected by courts. What is needed is, first, acknowledgement of the necessity of distinguishing the appropriate from the inappropriate occasions for overruling precedents, and, second, an attempt to develop a body of case law that gives courts improved guidance.

One step in the right direction is the attempt to articulate reasons for overruling in a particular case, or for not doing so, that are also reasons of general validity. Such a question of legal process, like questions of substantive law should be open to reasoned debate.

*Most formulations thus far attempted in this area have been extremely general in character, offering very little specific guidance.*

R. Keeton, *Venturing to do Justice: Reforming Private Law* 39 (1969) (emphasis added).

■ It is the historic policy of our courts to stand by precedent and not to disturb a settled point of law. *Neff v. George*, 364 Ill. 306, 307–11, 4 N.E.2d 388, 390–91 (1936). That policy, enshrined as the doctrine of *stare decisis*, forms the underpinning of an orderly, stable system of common law jurisprudence. Under that doctrine, a deliberate or solemn decision of a court, after

---

11. The time of actual or constructive discovery is an issue of fact. *Franklin*, 381 Mass. at —, 411 N.E.2d at 463; *Ayers*, 397 Pa. at 291, 154 A.2d at 793; *Hill v. Clarke*, 241 S.E.2d 572, 573 (W.Va.1978). If the trier of fact were to

determine that the plaintiff had actual or constructive knowledge of the foreign-object's presence more than two years before the action was commenced, section 753 would operate to foreclose recovery.

argument on a question of law fairly arising in the case, the disposition of which is necessary to the determination of the case, is an authority or binding precedent in the same court and in other courts of equal or lower rank, in subsequent cases where the very point is again in controversy. *State v. Mellenberger*, 163 Or. 233, 259–63, 95 P.2d 709, 719–20 (1939).

Precedents, once so established, however, do not become totally immune from change for all time. Were that to be so, there would be no room for the viable growth of the law; no opportunity for it to keep pace with the changing conditions of the society in which it must operate as the instrument of justice between citizens; and no capacity on its part to reflect, through time, even the most elemental recognition of the ethical values, the social mores, or any popular consensus as those evolve through societal experience. Rather, the law would be locked rigidly to the decisions of the past, rendered powerless to adapt to the needs and values of the present and deprived of all capacity to mold its content to the exigencies of the future. Proper respect for precedent as a source of stability does not require that each decided case must be held inviolate for all time.

We have repeatedly held that the doctrine of *stare decisis* is not an inflexible rule requiring this court to blindly follow precedents and adhere to prior decisions and that when it appears that public policy and social needs require a departure from prior decisions, it is our duty as a court of last resort to overrule those decisions and establish a rule consonant with our present day concepts of right and justice.

*Molitor v. Kaneland Community Unit District No. 302*, 18 Ill.2d 11, 25, 163 N.E.2d 89, 96 (1959) (citations omitted). This Court has been cognizant in the past of the need that established principles of law be subject to change in appropriate circumstances. We have, indeed, on recent occasion expatiated with some eloquence our recognition that by discreetly accomplishing such change,

... we do not undermine the principle of *stare decisis.* Rather, we prevent it from defeating itself; we do not permit it to mandate the mockery of reality and the 'cultural lag of unfairness and injustice', *Moulton v. Moulton,* ... [Me., 309 A.2d 224, 228 (1973) ] which would arise if the judges of the present, who like their predecessors cannot avoid acting when called upon, were required to act as captives of the judges of the past, restrained without power to break even those bonds so withered by the changes of time that at the slightest touch they would crumble.

*MacDonald v. MacDonald*, Me., 412 A.2d 71, 74 (1980). We have, within recent weeks, said that though we perceive and appreciate the need for the uniformity and certainty that the doctrine of *stare decisis* serves to produce, we also recognize "the dangers of a blind application of the doctrine merely to enshrine forever earlier decisions of this court." *See Adams v. Buffalo Forge Co.*, Me., 443 A.2d 932, 935 (1982).

The problem to be resolved is to distinguish on a case-by-case basis for articulated reasons those circumstances in which it is appropriate to overrule prior precedent from those in which it is inappropriate to do so. We have said in that regard that "[w]hen the conditions of society change to such an extent that past judicial doctrines no longer fulfill the needs of a just and efficient system of law, we should not be barred by the constraints of *stare decisis.*" *See Davies v. City of Bath*, Me., 364 A.2d 1269, 1273 (1976). We have said that judges must have "the power to move ahead amidst the onrushing currents of change in the present" in order to avoid the charge of creating "a cultural lag of unfairness and injustice." *See Moulton v. Moulton*, Me., 309 A.2d 224, 228 (1973). Finally, we have also said that where the authorities supporting the prior rule have "been drastically eroded, [and] ... the suppositions on which it rested are disapproved in the better-considered recent cases and in authoritative scholarly writings, and ... the holding of the [prior] case is counterproductive" to its purposes, the situation is appropriate

for legal change by the court's decision. *See Black v. Solmitz*, Me., 409 A.2d 634, 639 (1979).

The factual premises for the invocation of the legitimate exercise of the power to overrule *Tantish v. Szendey*, we think to exist at this time on the question presented by this case. We have a harsh and unjust rule which operates unfairly to erratically deprive patients of meritorious claims of often severe personal injury caused by negligence. Under the existing rule, such deprivation results from the passage of the statutory period of limitations under circumstances such that there is no possible way in which the patient can even be aware of her injury, much less take any effective steps to preserve her rights against the running of the statute of limitations. The existence or non-existence of the privilege to sue in such cases is made to depend, by the rule, on the timing of the discovery of the fact that a surgical object has been left in the patient in a prior surgical procedure. Where such discovery occurs by reasons of fortuitous physiological and medical factors (over which the patient generally has no control) more than two years after the performance of the surgery, the patient is deprived of her right to such relief in the courts, without any lack of diligence on her own part and before she has any knowledge that she has sustained an injury, much less achieved any recognition that she may have any occasion to seek legal relief.

In part, because of such considerations, the basis on which that rule was originally founded has, in the short space of twenty years, fallen into jurisprudential disrepute and is disapproved in the better-considered recent cases and in the authoritative scholarly writings. *Cf. Black*, 409 A.2d at 639. The rule is counterproductive to the achievement of any principled conception of fair and even-handed justice. The rule can no longer fulfill the needs of a just and efficient system of law. *Cf. Davies*, 364 A.2d at 1273. Continued adherence to the rule ties the hands of the judges of the present by blind acceptance of outmoded and currently unacceptable concepts of justice. *Cf. MacDonald*, 412 A.2d at 74. In

other areas of the law, that rule has been expressly rejected by this Court. *See Anderson v. Neal*, Me., 428 A.2d 1189 (1981).

The conceptual basis on which *Tantish* itself rests has been severely eroded in the twenty years since the case was decided. The *Tantish* Court acknowledged that, by applying the general accrual rule to acts of foreign-object surgical malpractice, it was following the weight of authority. 158 Me. at 231–32, 182 A.2d at 661. Indeed, the opinion in *Tantish* includes a lengthy quotation from *Capucci v. Barone*, 266 Mass. 578, 165 N.E. 653 (1929), in which the Supreme Judicial Court of Massachusetts adopted the identical rule. *Capucci*, however, was overruled in *Franklin*, —— Mass. ——, 411 N.E.2d 458, and few jurisdictions still retain the *Tantish* accrual rule. *See* note 8 *supra* and accompanying text. This substantial shift in authority colors, in part, our perspective on the continuing vitality of *Tantish*, because the *Tantish* Court itself found some solace in the number of jurisdictions adhering to that rule. *See MacDonald*, 412 A.2d at 73, and *Black*, 409 A.2d at 637, where this Court recognized the erosion of support for the particular rule embodied in the decisions there overruled.

■ Additionally, the Court in *Tantish* characterized the adoption of the discovery rule in foreign-object surgical malpractice actions as a legislative rather than a judicial prerogative. 158 Me. at 231, 182 A.2d at 661. This understanding of the limitations on judicial power is no longer viable. *See* discussion *supra* at 989–993. While the Legislature may expressly change the rule we announce today, our power to construe a statute cannot be regarded as foreclosed by legislative silence and inaction. Further, section 752–A, enacted in P.L.1975, ch. 434, which implements the discovery rule in malpractice actions against design professionals, constitutes a legislative recognition of the need to protect plaintiffs when the existence of the action is unknowable. *See* discussion *supra* at 997. A solid legislative endorsement of the discovery rule thereby has come into

existence since the opinion in *Tantish* issued. Thus, while the Legislature has remained silent as to section 753 itself, its adoption of the discovery rule in other contexts weighs heavily against the continuing vitality of the *Tantish* analysis.

And while the analytical underpinnings of *Tantish* manifest signs of enervating decay, the rule itself does not "fulfill the needs of a just and efficient system of law." *See Davies v. City of Bath*, Me., 364 A.2d 1269, 1273 (1976) (overruling cases applying sovereign immunity). On those occasions when the prevailing precedents lack vitality and the capacity to serve the interests of justice, we have departed from them. *See, e.g., MacDonald*, 412 A.2d 71; *Black*, 409 A.2d 634; *Davies*, 364 A.2d 1269; *Moulton*, 309 A.2d 224; *Brewer's Dairy v. Dolloff*, Me., 268 A.2d 636 (1970); *Beaulieu v. Beaulieu*, Me., 265 A.2d 610 (1970). *See also Anderson*, 428 A.2d at 1191; *Jones v. Billings*, Me., 289 A.2d 39 (1972). Because *Tantish* lacks that vitality and is unsuited to the modern experience, we reject it in favor of the rule announced today.

■ To respond, so far as the parameters of this case permit, to the need for a candid articulation of guidelines as to when and under what circumstances a prior precedent should and may be overruled, we may say at least the following. It is not only within the power of courts of last resort but it is their affirmative obligation to grapple with the need for, and the propriety of, a decision to overrule a prior precedent where: (1) the court is convinced that the rule of the prior decision operates harshly, unjustly and erratically to produce, in its case-by-case application, results that are not consonant with prevailing, well-established conceptions of fundamental fairness and rationally-based justice, (2) that conviction is buttressed by more than the commitment of the individual justices to their mere personal policy preferences, that is, by the substantial erosion of the concepts and authorities upon which the former rule is founded and that erosion is exemplified by disapproval of those conceptions and authorities

"in the better-considered recent cases and in authoritative scholarly writings," [13] (3) the former rule is the creation of the court itself in the legitimate performance of its function in filling the interstices of statutory language by interpretation and construction of vague, indefinite and generic statutory terms, (4) the Legislature has not, subsequent to the court's articulation of the former rule, established by its own definitive and legitimate pronouncement either specific acceptance, rejection or revision of the former rule as articulated by the court, and (5) the court can avoid the most severe impact of an overruling decision upon reliance interests that may have come into being during the existence of the former rule by creatively shaping the temporal effect of the new rule articulated by the holding of the overruling case.

The courts must approach the application of these and other similar guidelines soberly and with a profound reluctance for change in the substance of the law, but with a solid appreciation of their obligation to maintain the viability of the content of the law and thus its ability to operate to achieve a practical as well as an abstract justice by its application to controversies between citizens. It is very much the function of the court *"to prevent* the application of a universal legal principle in an eventuality where unconscionable and unjustifiable hardship must otherwise ensue." *See, e.g., Bedell v. Reagan*, 159 Me. 292, 298, 192 A.2d 24, 27 (1963) (emphasis added). We usually accomplish that preventative goal, and do so nearly every day, by the use of the technique of reasoned distinction of precedents to avoid unfair or practically unjustifiable results. That technique must remain the preferred instrumentality for the achievement of the goal of such prevention. However, in circumstances where that technique cannot be invoked with integrity, it must be remembered that *the goal*, not *the technique*, is controlling in shaping the role of the court in articulating just principles of law. Where such prevention is thought to

**13.** *Black*, 409 A.2d at 639.

be necessary and cannot be accomplished by avoiding, by distinction, the thrust of a precedent that is no longer worthy of application in the circumstances of the case, it is properly within the power of the court to achieve that goal by confronting frontally the reasons for, and the merit of, the prior rule. In doing so, the court is obliged to accomplish, where reasoned analysis dictates, needed substantive change.

## V. Temporal Application of the Discovery Rule

Consistently with our prior practice, the holding we announce today shall be applied on remand to the parties in this case. We have always applied the precept of an overruling case to the parties to that case.[14] The reasons most commonly put forth in other jurisdictions for this rule of at least limited retrospective effect are principally three:

1) to reward the diligence of the particular litigant who has secured the change of an outmoded or erroneous rule of law and to provide an inducement to the occurrence of such challenges in the future, *Molitor v. Kaneland Community Unit District No. 302*, 18 Ill.2d 11, 163 N.E.2d 89 (1959), *cert. denied* 362 U.S. 968, 80 S.Ct. 955, 4 L.Ed.2d 900 (1960); *Barker v. St. Louis County*, 340 Mo. 986, 104 S.W.2d 371 (1937); *Ramirez v. Amsted Industries, Inc.*, 86 N.J. 332, 356, 431 A.2d 811, 824 (1981); *see* Annot. "Prospective or Retroactive Operation of Overruling Decision," 10 A.L.R.3d 1371, § 8(b) (1966);

2) to prevent the newly announced rule of law from technically being mere *dictum*, *Stovall v. Denno*, 388 U.S. 293, 301, 87 S.Ct. 1967, 1972, 18 L.Ed.2d 1199, 1206 (1967); *Molitor*, 18 Ill.2d at 27, 163 N.E.2d at 97; *Kojis v. Doctors Hospital*, 12 Wis.2d 367, 374, 107 N.W.2d 292, 294 (1961); [15]

3) to avoid arbitrariness to individual litigants and to honor the court's obligation "to do justice to each litigant on the merits of his own case." *Desist v. United States*, 394 U.S. 244, 259, 89 S.Ct. 1030, 1039, 22 L.Ed.2d 248, 261 (1969) (Harlan, J., dissenting).

To deny to plaintiffs, who have undertaken to change the law, the fruit of their victory would destroy any incentive for the private litigant to challenge outmoded rules of law, and we would thereby dismantle the machinery by which change in the law is made real.

However, in adopting the new rule, we invoke our inherent authority [16] to make the

---

**14.** We have had occasion to consider, in only five cases over the last decade, the scope of the retrospective effect accorded to an overruling decision of this Court. *Davies v. City of Bath*, Me., 364 A.2d 1269 (1976) abolished the doctrine of sovereign immunity, overruled *Nelson v. Maine Turnpike Authority*, 157 Me. 174, 170 A.2d 687 (1961), and limited its retroactivity to the parties to the case. The holding was otherwise to have only prospective application. *Jones v. Billings*, Me., 289 A.2d 39 (1972) adopted the modified "attractive nuisance" doctrine of Restatement (Second) of Torts § 339, overruled *Lewis v. Mains*, 150 Me. 75, 104 A.2d 432 (1954), and limited retroactivity to the parties to that case and cases arising out of accidents occurring on or after date of accident in the case. *Black v. Solmitz*, Me., 409 A.2d 634 (1979), which limited the application of the doctrine of parental immunity and overruled *Downs v. Poulin*, Me., 216 A.2d 29 (1966), limited retroactivity to the parties to that case and cases arising out of injuries occurring on or after date of injury in the case. *Poulin v. Colby College*, Me., 402 A.2d 846 (1979) abolished the common-law distinction between licensees and invitees as basis for liability for defects in premises, overruling *Patten v. Bartlett*, 111 Me. 409, 89 A. 375 (1914), and limited retroactivity to the parties to that case and cases arising out of injuries occurring on or after the date of injury in that case. *MacDonald v. MacDonald*, Me., 412 A.2d 71 (1980) abolished the doctrine of interspousal immunity under Maine law, overruling *Abbott v. Abbott*, 67 Me. 304 (1877), and mandated full retroactivity.

**15.** *But see* R. Keeton, Venturing To Do Justice: Reforming Private Law 33–34 (1969), *quoted in* R. Aldisert, The Judicial Process 899–900 (1976), suggesting that a purely prospective application of a newly created rule is identical in effect to an affirmation of the vitality of the old rule. As the latter constitutes a "holding," Keeton asserts, so too does the former.

**16.** A state in defining the limits of adherence to precedent may make a choice for itself between the principle of forward operation and that of relation backward. It may say that decisions of its highest court, though later

change in all other respects prospective. *See Durham v. United States*, 214 F.2d 862, 874 (D.C.Cir.1954).[17] In our past cases we have assessed the existence of substantial reliance interests as an abstract proposition. *See MacDonald*, 412 A.2d 71; *Black*, 409 A.2d 634; *Poulin*, 402 A.2d 846; *Davies*, 364 A.2d 1269; *Jones*, 289 A.2d 39. Doing so here, one may legitimately think it likely that there has been substantial public reliance upon the former rule and little ability of litigants to foresee the change in the law accomplished by this opinion.[18] *See In Re Marriage of Brown*, 15 Cal.3d 838, 850, 544 P.2d 561, 568, 126 Cal.Rptr. 633, 640 (1976). In view of the firm acceptance of the accrual rule in this jurisdiction since 1962 and the possibility of substantial interests arising from reliance on that rule, deep concerns are expressed about an adoption of the discovery rule on other than a prospective basis, except for its application to the parties in this case. Because of such concerns, some members of the Court who join in this opinion do not favor overruling *Tantish* retrospectively. Accordingly, except for its application to the parties in this case, the discovery rule shall be applied only to acts of alleged malpractice occurring in the course of surgical procedures taking place on the date of this opinion and thereafter.

The entry is:

Judgment vacated.

Remanded to the Superior Court for further proceedings consistent with the opinion herein.

McKUSICK, C. J., and GODFREY, VIOLETTE and WATHEN, JJ., concurring.

DUFRESNE, Active Retired Justice, with whom NICHOLS, Justice, joins, dissenting.

The legislative and executive departments of the State can be checked by the judicial department when they exceed their powers, but the judiciary is unique among the three branches of government in that the court is the judge of its own power. As stated by Justice Stone, in *United States v. Butler*, 297 U.S. 1, at 79, 56 S.Ct. 312, at 325, 80 L.Ed. 477, (dissenting opinion) (1936), "the only check upon our own exercise of power is our own sense of self-restraint." Recognizing that the Constitution of the State of Maine does not grant the judiciary the power to repeal or amend legislation in order to reach results deemed more desirable, I dissented in *Anderson v. Neal*, Me., 428 A.2d 1189 (1981), where this Court adopted the discovery rule, so-called, in construing the legislative meaning of "accrual" of action in a legal malpractice case. Sensitive to the oath of office which I took and subscribed on assuming the duties as a justice of this Court (*see* Article IX, Section 1) and viewing with alarm this Court's repeat performance in judicial legislation in the area of medical malpractice, I

---

overruled, are law none the less for intermediate transactions ... whenever injustice or hardship will thereby be averted.
*Great Northern Ry. Co. v. Sunburst Oil & Refining Co.*, 287 U.S. 358, 364, 53 S.Ct. 145, 148, 77 L.Ed. 360, 366 (1932).

**17.** In *Durham*, the federal court was determining the substantive criminal law of the District of Columbia. The court functioned as a state court as the case was not based upon federal statutes of national applicability. *See Keller v. Potomac Elec. Power Co.*, 261 U.S. 428, 442–43, 43 S.Ct. 445, 448–49, 67 L.Ed. 731, 736 (1923). Its inherent power was therefore parallel to that of state courts generally in that circumstance.

Since the federal court issued its opinion in *Durham*, Congress has created a court system in the District of Columbia, separate and dis-

tinct from the federal courts, which is analogous to those found in the states. District of Columbia Court Reorganization Act of 1970, Pub. L. No. 91–358, 84 Stat. 473.

**18.** *Tantish* established the accrual rule in 1962. There has been no challenge to that rule in this Court until the present case. It has been accepted as the law of this jurisdiction by the federal courts. *See Clark v. Gulesian*, 429 F.2d 405 (1st Cir. 1970). The only intimation of any inclination in this Court to reconsider that rule occurred only one year ago in *Anderson v. Neal*, Me., 428 A.2d 1189, 1193 (1981), when we said, "The principles we here apply may require a re-examination of *Tantish v. Szendey, supra*, in the medical malpractice area when the issue is properly before us."

must respectfully dissent. The obligation to support the constitution is imperative and unceasing. *State v. Butler*, 105 Me. 91, at 102, 73 A. 560 (1909).

The dissent in *Anderson* fully answers the majority's opinion in this case and I see no useful purpose to be served in restating again in detail my views respecting the construction of the kindred statute, 14 M.R.S.A. § 753, which provides as follows:

"Actions for assault and battery, and for false imprisonment, slander, libel and malpractice of physicians and all others engaged in the healing art shall be commenced within 2 years after the cause of action accrues."

I do wish to note, however, in summary fashion, that, prior to *Anderson*, except where mandated by legislative enactment, this Court had religiously adhered to the traditional concept that a cause of action in tort accrues at the time when the plaintiff sustains a judicially cognizable injury, to the extent on numerous occasions of rejection of litigants' request that a discovery rule be adopted in connection with the application of statutes of limitation.[1] The majority further concedes that in the case of *Tantish v. Szendey*, 158 Me. 228, 182 A.2d 660 (1962), this Court again refused to adopt the discovery rule in construing the meaning of "accrual of action" in connection with the very statute presently under construction and in relation to medical malpractice based on an identical fact pattern such as the leaving of a foreign object in the body of a surgical patient.

Aware of the general principle that there should be no wrong without a remedy, a right guaranteed by the Maine Constitution,[2] nevertheless, I do recognize that the implementation of the stated guaranty remains subject to governance and control in its enforcement and administration by reg-

ulatory and procedural legislation enacted by the legislative department known as statutes of limitation, which limit the time within which actions to enforce the right of redress may be taken. *See Alvarado v. Gonzales*, 552 S.W.2d 539, 542 (Tex.Civ.App. 1977); *Horn v. City of Chicago*, 403 Ill. 549, 87 N.E.2d 642, 649 (1949).

Statutes of limitation are creatures of the Legislature, and the Legislature alone has power to fix the conditions under which they may operate.[3] *Stevens v. Sacramento Suburban Fruit Lands Co.*, 109 Cal.App. 120, 292 P. 699, 710 (1930). They have long been recognized as a valid exercise of a state's right to regulate the functioning of its judicial system. *Thompson v. Thompson*, 40 Md.App. 256, 390 A.2d 1139, 1141–42 (1978). They represent a public policy about the privilege to litigate. *Dunn v. Felt*, Del.Super., 379 A.2d 1140, 1141 (1977). It is the prerogative of the Legislature to fix the time in which causes of actions must be commenced and no court will excuse a delay beyond the statutory temporal requirement, provided the time limitation is reasonable, reasonableness being primarily a legislative matter. *Plant v. R. L. Reid, Inc.*, 294 Ala. 155, 313 So.2d 518, 522 (1975).

On the other hand, in *Farris, Attorney General v. Goss*, 143 Me. 227, 230, 60 A.2d 908 (1948), this Court said that it is not concerned with the consequences of statutory provisions. The court's duty is to interpret, not to make the law.

Determination of legislative intent is the fundamental rule in the judicial construction or interpretation of statutes. *State v. Hussey*, Me., 381 A.2d 665, 666 (1978); *Labbe v. Nissen Corp.*, Me., 404 A.2d 564, 567 (1979). Legislative intent must be factually determined as of the time of the enactment or reenactment of the law under

---

1. The discovery rule was repudiated in *Bishop v. Little*, 3 Me. 405 (1825); *Betts v. Norris*, 21 Me. 314, 38 Am.Dec. 264 (1842) and *Bozzuto v. Ouellette*, Me., 408 A.2d 697 (1979).

2. See Article 1, § 19 of the Constitution of Maine: "Every person, for an injury done him in his person, . . . shall have remedy by due course of law; . . . ."

3. We are not dealing here with the doctrine of laches developed by courts of equity in analogy to statutes of limitation, but grounded on equitable principles. *See Spaulding v. Farwell*, 70 Me. 17 (1879); *Stewart v. Grant*, 126 Me. 195, 201, 137 A. 63 (1927).

consideration, with resort to the history of the legislation, if need be. *See Mundy v. Simmons*, Me., 424 A.2d 135, 138 (1980). When legislative intent can be determined, whether by direct analysis of the statute involved viewed as a whole or by consideration of statutes in pari materia, or indirectly by resorting to legislative history surrounding the legislation, courts must give effect to the legislative will as ascertained. *See State v. Goyette*, Me., 407 A.2d 1104, 1110 (1979); *Cummings v. Town of Oakland*, Me., 430 A.2d 825, 829 (1981).

A proper construction of the statutory language in the instant case, 14 M.R.S.A. § 753, can be found in the light of the legislative grouping in one single two-year limitation statute the tort action of malpractice of physicians with the four other tort actions of assault and battery, false imprisonment, slander and libel. Such structural arrangement, wherein the common terminology "within 2 years after the cause of actions accrues" was used with respect to all five enumerated actions, is a clear indication on the part of the Legislature that the traditional meaning of accrual of a cause of action in tort (i.e. the time when the plaintiff sustains a judicially cognizable injury), which undisputably would apply to the actions of assault and battery, false imprisonment, slander and libel, was meant to carry over to the action for medical malpractice. In the construction of statutes, the maxim "noscitur a sociis" serves as a useful aid in ascertaining the meaning or application of words of broad implication such as "within 2 years after the cause of action accrues." The association of the confusing expression with an enumerated group of subjects to which it is intended to have application should reveal, as it does in the instant case, the intent on the part of the Legislature to use the expression in light of the common thread underlying the several objects upon which it is made to operate. Words may be known by the company they keep. Associated terms, expressions or words are properly held to take their color from each other. *See Trafton, Appellant*, 94 Me. 579, 580, 48 A. 113 (1901); *Rockland Water Company v. Cam-*

*den and Rockland Water Company*, 80 Me. 544, 566, 15 A. 785 (1888).

Also, we must presume that the Legislature, in anchoring the running of this specific statute of limitation respecting physician malpractice actions at a broad but single point of departure such as the accrual of the cause of action as applied to all five stated causes, including assault and battery, false imprisonment, slander and libel, sought to establish a collective but uniform and consistent limitational pattern, compelling a similar construction of its singular statutory provision even though applicable to different particular types of judicial processes. *See Colonial Builders and Investors v. Meier*, Me., 417 A.2d 422, 424–25 (1980); *Delano v. City of South Portland*, Me., 405 A.2d 222, 227 (1979). Such precludes any intent on the part of the Legislature to incorporate into the statutory provision the discovery concept in favor of physician malpractice actions alone.

The majority claims that, when the Legislature in 14 M.R.S.A. § 753 failed to specify when the respective causes of action enumerated therein accrued, it intended to delegate to the courts the power from time to time to determine and establish that point of time from which the intended limitations statute would commence running, and that, absent future "explicit legislative direction" thereon, the process of defining the term "accrual" of these respective causes of action remains a judicial function. Such judicial activism as displayed in the instant case is constitutionally prohibited and contrary to legal precedents of this Court which have stood for more than one hundred and fifty years.

Our Constitution mandates that the separation of powers among the three branches of government be maintained:

"The powers of this government shall be divided into three distinct departments, the legislative, executive and judicial.

"No person or persons, belonging to one of these departments, shall exercise any of the powers properly belonging to either of the others, except in the cases

herein expressly directed or permitted." Constitution of Maine, Art. III, Sections 1 and 2.

Not only is the Legislature not authorized to transfer any of its legislative power and responsibility, but it is expressly forbidden to transfer any part thereof to either the executive or the judicial or to any member of either department. In *State v. Butler*, 105 Me. 91, 73 A. 560 (1909), this Court cited with approval the holding of the Michigan Court in *King v. Concordia Ins. Co.*, 140 Mich. 258, 103 N.W. 616 (1905), wherein a statute purporting to empower a commission to frame a standard insurance policy and to make such changes in it from time to time as justice and equity might require was held void. *See also Brown v. State, Dept. of Manpower Affairs*, Me., 426 A.2d 880, 884 (1981); *State v. Fixaris*, Me., 327 A.2d 850, 853 (1974).

It is to be presumed that the Legislature in enacting 14 M.R.S.A. § 753 was fully aware that incorporation into our statutes, by express reference or implicit understanding, of *future* judicial revisions or alterations of the meaning of "accrual" of the enumerated causes of action as the judiciary may from time to time deem advisable would constitute an unlawful delegation of legislative power. *See State v. Intoxicating Liquors*, 121 Me. 438, 443, 117 A. 588 (1922); *State v. Webber*, 125 Me. 319, 321, 133 A. 738 (1926). The Legislature may not constitutionally delegate *general* legislative authority. *State v. Prescott*, 129 Me. 239, 242, 151 A. 426 (1930).

To restructure the limitations statute respecting the accrual of the cause of action of medical malpractice by rewriting it into a mold which would accommodate the requirements of the discovery rule, so-called, after this Court in *Tantish v. Szendey* had specifically given the very same statute its narrow construction in relation to an identical situation, would in the light of *State v. Holbrook*, Me., 318 A.2d 62 (1974) be a transgression of the proper bounds for interpretation of the meaning of a statute and smack of judicial legislation, constitutionally forbidden by the Constitution.

In construing statutes, courts expound the law; they cannot extend their application, nor amend them by the insertion of qualifying conditions. *See State v. Standard Oil Co.*, 131 Me. 63, 64, 159 A. 116 (1932).

To overrule *Tantish v. Szendey, supra*, and adopt the discovery rule as part and parcel of 14 M.R.S.A. § 753 would constitute a flagrant usurpation of a prerogative belonging solely to the Legislature and be subversive of those principles which are the foundation of orderly government. It would also signal a radical departure from a well-recognized rule of statutory construction to the effect that, absent a clear purpose to intend otherwise, the Legislature is presumed to have in mind the decisions of this Court and, when using legislative language which has been given a specific meaning by judicial construction, it must be deemed to have adopted the judicially declared interpretation.

This Court has repeatedly held that the reenactment of a statute which has received judicial construction adopts the construction given to it. *General Motors Acceptance Corporation v. Anacone*, 160 Me. 53, 78, 197 A.2d 506, 521 (1964); *Hutchins v. Libby*, 149 Me. 371, 379, 103 A.2d 117 (1953); *Inhabitants of Town of Winslow v. Inhabitants of City of Old Town*, 134 Me. 73, 76–77, 181 A. 816 (1935); *Bennett v. Bennett*, 93 Me. 241, 242, 44 A. 894 (1899).[4]

In *State v. Crocker*, Me., 435 A.2d 58, decided as late as September 18, 1981, nearly 5 months after the decision in *Anderson v. Neal*, this Court held that previous constructions by this Court of the undefined term "depraved indifference to the value of human life," as employed in the depraved indifference murder statute, "became a part of the statute as definitely as if the Legislature itself had amended the statute to reflect expressly the judicial construction." Accord: *State v. Davenport*, Me., 326 A.2d 1 (1974).

4. For other cases, *see* cases cited in *Anderson v. Neal*, Me., 428 A.2d at 1197.

To advance the conjecture that the legislative failure to give statutory recognition to a discovery rule may have resulted from the 'belief that the matter should be left to be handled by the normal processes of judicial development of decisional law, including the overruling of outstanding decisions to the extent that the sound growth of the law requires' as quoted in *Anderson v. Neal,* at 1191, not only involves the entertainment of a concept invidious to the separation-of-powers clause of our Constitution as indicated previously, but is clearly contrary to the historical facts surrounding legislative activity relating to the existing limitations statute applicable to causes of medical malpractice as interpreted by this Court in *Tantish v. Szendey.* In the first legislative session following this Court's decision in *Tantish v. Szendey,* and in the One Hundred and Fourth Legislature, bills were introduced to incorporate the discovery rule in the medical malpractice statute of limitations. Both failed. During consideration of the Pomeroy Commission Report by the One Hundred and Eighth Legislature similar proposals were attempted. The transcript of the legislative debate definitely shows an awareness on the part of the members of the Legislature that

> "Maine already has one of the most restrictive statutes of limitations of any state in this nation;" (Mr. Kelleher, Legislative Record, 1977, Vol. II, at 1946) "The current situation is and current law [is] that you have up to two years after the act with respect to a physician and up to six years after the act with respect to a hospital to bring suit. *That is after the act has occurred.*" (Emphasis provided)
> \* \* \* \* \* \*
> "What I can't live with is my telling somebody who finds out that they have been malpracticed against two years and one day afterward, I have to say to them, sorry, you have no remedy whatsoever.

*That is the way the law is.* It seems the fairer way to proceed is to say that a person has two years from the day they did discover the incident of malpractice. This proposal would give a person the right to sue two years after the date they discover the situation but not more than six years." (Emphasis added). (Mr. Henderson, Legislative Record, at 2090).

"Physicians, under the present law, have two years *from the date of occurrence* . . . . I think that it would ill provide us to increase this with the very vehicle that we are making a sincere attempt and it is obvious by the action of this legislature to turn around the proliferating costs of health care." (Emphasis superimposed). (Mr. Norris, Legislative Record, at 2091).

A proposed amendment [5] to the Pomeroy Commission legislative recommendations which would have subjected the limitations period in the case of physician malpractice suits to the requirements of the discovery rule was indefinitely postponed, and thus defeated in the House, by a vote of 83 to 17. *See* Legislative Record, One Hundred and Eighth Legislature, Vol. 11, at 2091. The indefinite postponement of legislative proposals which would have incorporated the discovery rule as part of the medical malpractice limitations statute, 14 M.R.S.A. § 753, clearly demonstrates *positive action* on the part of successive legislatures in maintaining the original policy underlying such legislation and completely dispels the notion of legislative silence or inaction as some have suggested.

Furthermore, not only did the One Hundred and Eighth Legislature knowingly leave in full force and effect the medical malpractice limitations statute, as construed by this Court in *Tantish v. Szendey,* in situations to which it applied, but it added further limitations on the cause of action of medical malpractice by providing immunity from civil liability to licensed physicians for volunteer activities on their

---

**5.** House Amendment "E" read as follows:

Sec. 1.   14 M.R.S.A. § 753 is amended to read:
 Actions for malpractice of physicians and all other engaged in the healing art shall be commenced within 2 years from the date that the act of malpractice was or, with the use of reasonable diligence, could have been discovered, but in any case no action may be commenced more than 6 years after the cause of action accrues.

part in specified circumstances, "unless it is established that the injuries or the death were caused wilfully, wantonly, recklessly or by gross negligence of the licensed physician." 24 M.R.S.A. § 2904.

Following legislative debates which made it crystal clear that the expression "within 2 years after the cause of action accrues" was intended and understood to mean within 2 years of the occurrence of the malpractice incident as this Court had construed the identical terminology in *Tantish v. Szendey*, this same Legislature enacted 24 M.R.S.A. § 2902, which brought within the same two-year period of limitations actions for damages against nurses and hospitals and their employees.[6] To contend that the Legislature in this instance intended to leave it to the judicial department to construe these words of art contrary to the interpretation given to them in *Tantish v. Szendey* is to be blind to reality and foster invidious judicial intrusion in the legislative process to which under the constitutional mandate of the separation-of-powers clause we should pay just deference.

Legal terms of art should be construed according to their accepted usage, especially when it appears that such a construction was legislatively intended. *See Pride's Corner Concerned Citizens Association v. Westbrook Board of Zoning Appeals*, Me., 398 A.2d 415, 417 (1979). If a term or expression as used in a statute have already been given a legal meaning by the courts, it is presumed that the Legislature attached the same meaning to them when used on a subsequent occasion. *See Sweeney v. Dahl*, 140 Me. 133, 138, 34 A.2d 673, 675, 151 A.L.R. 356 (1943). The Legislature must be supposed to employ language relating to legal proceedings, in its well known legal acceptation. *McLellan v. Lunt*, 14 Me. 254, 258 (1837).

As stated by Justice Holmes in *Johnson v. United States*, 1st Cir., 163 F. 30, at 32 (1908):

The Legislature has the power to decide what the policy of the law shall be, and if it has intimated its will, however indirectly, that will should be recognized and obeyed.

*See also, Wichelman v. Messner*, 250 Minn. 88, 83 N.W.2d 800, 812, 71 A.L.R.2d 816 (1957).

Statutes of limitation are established by the legislative branch of government and their purpose is to cut off rights that might otherwise be asserted. They often operate against meritorious claims. They may bring about inequitable results and prevent relief in hardship cases, catastrophic or otherwise. In any case, they must be strictly adhered to by the judiciary and relief from their harsh and inequitable consequences must be provided by the legislative department, and not by the courts. *See Abbott v. Johnston*, 130 Ark. 1, 195 S.W. 676, 678 (1917); *Carver v. Moore*, Com.App., 288 S.W. 156, 159 (Tex.1926); *Glashoff v. Glashoff*, 57 Cal.App.2d 108, 134 P.2d 316, 319 (1942); *Kavanagh v. Noble*, 332 U.S. 535, 68 S.Ct. 235, 237, 92 L.Ed. 150, reh. denied 333 U.S. 850, 68 S.Ct. 656, 92 L.Ed. 1132 (1947); *Hunter v. Hunter*, 361 Mo. 799, 237 S.W.2d 100, 104, 24 A.L.R.2d 611 (1951); *Shearin v. Lloyd*, 246 N.C. 363, 98 S.E.2d 508, 514 (1957); *Gamma Tau Educational Foundation v. Ohio Casualty Ins. Co.*, 41 Wis.2d 675, 165 N.W.2d 135, 139 (1969); *Tilden v. Anstreicher, M. D.*, Del.Supr., 367 A.2d 632, 635 (1976).

Where, except for the 1977 amendment (24 M.R.S.A. § 2904) as heretofore stated, the Legislature failed to insert in the medical malpractice limitations statute any specific exception such as the discovery rule would generate, our courts are not free to engraft any therein. *See Davis v. Howe*, Com.App., 213 S.W. 609, 611 (Tex.1919); *McMahan v. Dorchester Fertilizer Co.*, 184 Md. 155, 40 A.2d 313, 316 (1944); *Harrison v. Holsenbeck*, 208 Ga. 410, 67 S.E.2d 311,

---

6. § 2902. Statute of limitations for hospitals and employees

An action for damages for injury or death against any nurse licensed under Title 32, chapter 31; any hospital or its employee, whether based upon tort or breach of contract or otherwise, arising out of patient care, shall be commenced within 2 years after the cause of action accrues.

313 (1951); *Frazee v. Partney*, 314 S.W.2d 915, 919 (Mo.1958); *Jones v. Rabinowitz*, 296 F.Supp. 123, 125 (1969); *Moore v. Delivery Services, Inc.*, Okl.App., 618 P.2d 408, 409 (1980).

If I were a member of our Legislature, I might conclude that medical malpractice actions of any kind, including those based on foreign objects left in the body of surgical victims, should be barred after two years from the time the plaintiff discovers, or, in the exercise of reasonable care and diligence, should have become aware of, the malpractice and that for the benefit of the general public the existing law, as interpreted in *Tantish v. Szendey*, should be amended. But as a member of this Court, I have no right to be blind to the separation-of-powers clause of the Constitution and amend existing law contrary to the clear wishes of our Legislature, solely because in the instant case the enforcement of the statute of limitations does result in a harsh and inequitable result. The wisdom of a statute is for the Legislature, and not the Court, to consider. *See Camp Emoh Associates v. Inhabitants of Lyman*, 132 Me. 67, 70, 166 A. 59 (1933). It is not our duty to sit in judgment as to the efficacity or wisdom of a particular statute. *Shapiro Bros. Shoe Co., Inc. v. Lewiston-Auburn S.P.A.*, Me., 320 A.2d 247, 257 (1974).

We must realize that we are not dealing, here, with a rule of law or policy created and adopted wholly by the courts and which remains subject to judicial change, unless specifically and expressly enacted into law by the Legislature. Such are all our rules inherited from the common law and several of our past judicial doctrines which this Court has now repudiated and from which the majority claims so much support. I view the doctrines of sovereign immunity, municipal immunity, parental immunity, interspousal immunity, attractive nuisance, the common law status distinctions between licensees and invitees, as wholly created by the court and subject to court demolition, a stance in no way inconsistent with my present position respecting the reference statute of limitations as construed by this Court in *Tantish v. Szendey*.

The decisions of *James v. United States*, 366 U.S. 213, 81 S.Ct. 1052, 6 L.Ed.2d 246 (1961), *Girouard v. United States*, 328 U.S. 61, 66 S.Ct. 826, 90 L.Ed. 1084 (1946) and *Helvering v. Hallock*, 309 U.S. 106, 60 S.Ct. 444, 84 L.Ed. 604 (1940), cited by the majority, are not persuasive in support of the majority's position. They stand for the principle that the Court has an inherent right to correct itself where no settled statutory construction is involved. *James* purported to correct the Court's original "blunder" in deciding that embezzled funds are not taxable gains and reportable as gross income within the federal act in the year in which the funds are misappropriated. In our present case, nobody claims that the Williamson court mistakenly construed the statute at the time of its decision in *Tantish v. Szendey*. Rather, the majority arrogates to this Court the very broad power to redefine any legislative term, *as circumstances require*, and to re-interpret the legislation in light of changed conditions, "so long as the Legislature does not preempt the pertinent statutory meaning by its own definitive and legitimate pronouncement," contrary to this Court's long precedential history of one of its most consistently followed rules of statutory construction to the effect that legislative language once judicially interpreted acquires a settled meaning binding on the courts thereafter. *General Motors Acceptance Corp. v. Anacone*, 160 Me. 53, 197 A.2d 506 (1964); *Hutchins v. Libby*, 149 Me. 371, 103 A.2d 117 (1953); *Inhabitants of Town of Winslow v. Inhabitants of City of Old Town*, 134 Me. 73, 181 A. 816 (1935); *Sacknoff v. Sacknoff*, 131 Me. 280, 161 A. 669 (1932); *East Livermore v. Livermore Falls Trust & Banking Co.*, 103 Me. 418, 429, 69 A. 306, 15 L.R.A., N.S. 952 (1907); *Tuxbury's Appeal*, 67 Me. 267 (1877); *Cota v. Ross*, 66 Me. 161, 165 (1877); *Osgood v. Holyoke*, 48 Me. 410, 414 (1861); *Myrick v. Hasey*, 27 Me. 9, 17, 46 Am.Dec. 583 (1848).

*Girouard* repudiated prior court holdings that barred admission to citizenship to aliens who refused to bear arms, on the ground that it was error as an original

proposition for the court to insert in the Act of Congress by implication a prerequisite which Congress in no way had indicated should be in the legislation. In our present case, some twenty years after specific, articulate and well-reasoned judicial construction of this limitations statute in the area of medical malpractice, the majority worms into the legislation the discovery rule, which the Legislature, not only never implied should be part of this legislation, but on numerous occasions refused to let become the law of the land.

The instant case does not present a similar situation as found in *Helvering v. Hallock, supra,* where the court refused to honor a previous holding of the court relating to certain trust property as being included in a decedent's gross estate, where, on further examination, the distinctions, espoused in the prior holding, appeared "consonant neither with the purpose of the statute nor with this Court's own conception of it." The majority's amendment of the instant statute is not based on any such rationale as mentioned in the *Helvering* case.

As stated by Justice Jackson in *Chase Securities Corp. v. Donaldson,* 325 U.S. 304, 314, 65 S.Ct. 1137, 1142, 89 L.Ed. 1628, 1635–36 (1945):

[Statutes of limitation] are by definition arbitrary, and their operation does not discriminate between the just and the unjust claim, or the voidable and unavoidable delay. They have come into the law not through the judicial process but through legislation. They represent a public policy about the privilege to litigate.

... [The individual] may, of course, have the protection of the policy while it exists, but *the history of pleas of limitation shows them to be good only by legislative grace and to be subject to a relatively large degree of legislative control.* (Emphasis additional).

I would deny the appeal and affirm the judgment of the Superior Court in favor of the defendant.